**CHAIN O'MINES, Inc., et al. v. UNITED GILPIN CORPORATION et al.**

No. 6779.

Circuit Court of Appeals, Seventh Circuit.

Jan. 26, 1940.

Rehearing Denied March 2, 1940.

618

Abraham W. Brussell and John Mulder, both of Chicago, Ill., for appellants.

Johann Waage and Louis Cohen, both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a decree directing defendants to convey to plaintiffs, free of claim for money advanced to satisfy liens, and without right to any reimbursements, certain mining properties in Colorado theretofore owned by Chain O'Mines. The order of conveyance was based on the theory and the finding that the defendants acquired the property through a fraudulent conspiracy.

The facts are most complicated. They can be best stated by identifying the chief actors, both personal and corporate, and setting forth the historical facts, chronologically.[1]

[1] Chronological Statement.

| | | | |
|---|---|---|---|
| July | 19, | 1929 | Chain O'Mines Incorporated. |
| June | 15, | 1932 | Chain O'Mines executed trust deed for $300,000, Munroe, trustee, which mortgage District Court found to be a first lien on plaintiff's property. |
| March | 17, | 1934 | Lewison and Public Service Co. got decree against plaintiff in Colorado state court for labor and power lien claims. |
| May | 8, | 1934 | Kremm again elected director of plaintiff. |
| " | | " | Kremm found to have started fraudulent conspiracy with Schwerin and appointed Seeley as agent. |
| May | 22, | " | Plaintiff's property sold to satisfy liens, to Lewison and Williams for $97,226.65. |
| " | 19, | " | Kremm and Schwerin, without knowledge of plaintiff, filed involuntary petition in bankruptcy against plaintiff in Illinois. |
| " | 21, | " | Kremm contracted with Williams, attorney for Lewison, to purchase the labor lien certificate for $48,500. |
| " | 29, | " | Kremm authorized by the plaintiff's board of directors to file answer to bankruptcy petition, denying bankruptcy. |
| June | 4, | " | Answer in bankruptcy filed. |
| " | 18, | " | The important contract executed whereby Seeley agreed to purchase the labor certificate paying $5,000, June 22, 1934, and $5,000, Aug. 22, 1934, and $5,000 thereafter bimonthly until $48,500 was paid. Seeley agreed to assign labor certificate to a corporation to be formed which corporation would float a $2,000,000 mortgage. Seeley was to be relieved of personal liability after paying the first $5,000. Seeley by this contract was also given right to use the plaintiff's property. Contract provided that plaintiff might have thirty day extension in payment of the $5,000 instalments upon penalty of paying an extra $5,000. Lewison signed this contract, June 19, 1934. |
| June | 19, | " | Special meeting of board of directors of plaintiff, in office of Kremm, at which Kremm, Schwerin, and Seeley presented contract between Seeley (appointee of Kremm, Schwerin and plaintiff) and Williams, and Public Service Co. Plaintiff had canvassed all its stockholders and creditors for funds, and the Seeley contract resulted, and the Board approved it. |
| " | | " | Company (plaintiff) indebted on this date to its unsecured creditors to the extent of $198,000. |
| July | 6, | " | Dr. Muchow delivered possession of the plaintiff's property to Kremm, Schwerin and Seeley. |
| July | 19, | " | Plaintiff owned all the property here involved. |
| " | 23, | " | Central City Gold Mines Co. formed by Schwerin, Seeley, and Kremm, to have the contract rights under the June 18 contract. |

Plaintiff, Chain O'Mines, was in 1934 the owner of large tracts of land described as gold mining properties. Its financial affairs were in desperate straits. Its property was subject to a $300,000 mortgage. It had unsecured creditors with claims aggregating $100,000. There were unpaid taxes, and labor and power claims. Two holders of labor and power claims, the Public Service Co. of Colorado and Ed-

| | | | |
|---|---|---|---|
| " | 26, | " | Public Service Co. and Central City Co., through Kremm, Schwerin and Seeley, made contract to sell the former's interest in the labor lien, for $33,000, $1,500 down and $1,500 thereafter each month beginning Sept. 1, 1934 (to be paid in certain securities) and purchaser agreed to pay $3,794.78 on taxes then owing. |
| Nov. | 14, | 1934 | Kremm resigned as director. |
| Dec. | 4, | " | Sheriff's deed issued on Lewison and Public Service Certificate. |
| March | 7, | 1935 | Last extension granted by Public Service and Lewison to Central City. |
| April | 22, | " | United Gilpin was caused to be formed by Kremm, Schwerin, and Seeley, in Colo. by Charles Enos, atty., Theodore Chisholm, Joseph Morrato. Pages J. Thibodeaux was elected pres.; Laura O. Byron, secretary; Kremm, director and chairman of the Board. |
| April | 30, | " | Lewison and Hurter (employee BeeDee Co.) contracted. Hurter agreed to buy 63475/97226th interest in sheriff's certificate of sale for $42,000 with down payment of $1,500 which was paid by BeeDee and Hurter was given possession of the property. |
| " | | | Central City Co., by Kremm, pres., assigned to BeeDee, Central City's contract with Public Service Co. |
| May | 1, | " | Hurter offered by letter (and was accepted) to United the right to buy the labor lien certificate for 340,000 shares common stock of United, and United's note for $49,000 due in one year and United accepted the proposal the same day. |
| " | | | Beedee offered United interest in contract between Public Service and Central City to United for 9993 shares common stock of United. |
| " | 3, | " | Beedee transferred its interest in the contract between Public Service Co. and Central to United for 9993 shares common stock. |
| Jan. 9-Nov. 13, 1936 | | | Treasurer of Gilpin County executed tax deeds on plaintiff's property to Charles Enos, attorney. |
| Sept. | 29, | 1936 | Enos executed quitclaim deed to Seeley conveying all right to property. |
| Oct. | 22, | " | Seeley filed suit against Chain O'Mines to quiet title to property acquired by tax deeds. Plaintiff answered denying Seeley had superior title and claimed that Seeley had failed to comply with contract of June 19, 1934, providing for a $2,000,000 mortgage, and Seeley replied that that contract was void. |
| Jan. | 29, | 1937 | Seeley and wife executed quitclaim deed for property to Laura O. Byron of Chicago. |
| Aug. | 4, | " | Byron executed trust deed securing indebtedness of $27,575 covering all property, she got from Seeley and Cook to Beedee. She also gave a deed to United of property she got by quitclaim from Seeley. Cook was assignee of interest of Public Service Co. of sheriff's deed. |
| Sept. | 2, | " | United filed its own suit in Colorado against plaintiff to quiet title. |
| Sept. | 5, | " | United asked that it be substituted for Seeley as plaintiff, because it acquired the property through conveyance. |
| Nov. | 23, | " | Instant suit started by Chain O'Mines on behalf of its stockholders. Plaintiff has 1,989,886 shares of stock outstanding in the hands of 1100 stockholders representing an investment of $1,800,000. |
| April | 9, | 1938 | Decree entered from which appeal is taken. |
| Personnel. | | | |
| Plaintiff | | | Chain O'Mines (its stockholders are the other plaintiffs) incorporated in Nevada, July 19, 1929, Dr. William M. Muchow, President. |

ward H. Lewison (through his attorney Leroy J. Williams), owned a lien claim (approximately 32/97ths and 65/97ths, respectively) which they purchased on public sale for $97,226.65. It was in an attempt to rescue Chain O'Mines property from this lien that most of the ensuing complications and difficulties arose. The fractional interests, during the redemption period, were the constant subject matter of contract between the owners and the corporate and personal defendants, which contracts arranged for instalment payment. These contracts generally were immediately in default, and new efforts were directed to financing the defaults.

A Dr. Muchow had been the leading spirit in Chain O'Mines, and he tried desperately to raise money from the stockholders, and failing this, approached defendant Georges Kremm, a Chicagoan, and one evidently well versed in corporate finance. Kremm put Charles L. Schwerin and Louis M. Seeley into the picture, the former, president of many corporations, and the latter on the board of a Colorado corporation. These three men are the central figures in the alleged conspiracy, the corporate defendants being instruments of

their creation in furtherance of their alleged scheme, and employees of those corporations. These three men personally contributed substantial amounts which were used in the purchase of the lien certificates and towards the operation of the plaintiff company and its mines.

The District Court was of the firm belief that the three men (and incidentally the other defendants) had devised a fraudulent scheme whereby they would gain possession of the plaintiff's mines, and that they in fact mined ore greatly in excess of the value of $700,000* for which they should account. The trial court interpreted the defendants' failure to float the $2,000,000 mortgage provided for by the June 19, 1934 contract as indicative of their intent to cheat the plaintiff after lulling the plaintiff and its stockholders into the belief that the acquisition of the labor and power lien certificate with defendants' funds was a temporary phase in the refinancing project, and that all its property would be restored to it upon the floating of this mortgage, which never occurred.

The conclusions of law which the District Court made after hearing the evidence may be briefly summarized as fol-

Defendants:

Public Trustee, Gilpin County, dismissed, no service.

Charles L. Schwerin (Pres. of Bldg. Dev. Co. of Wis., which owns the Riverside Theatre and Empire Bldg.; pres. of Water Wis. Co. owning Bankers Bldg. in Milwaukee; pres. of Reywall Bldg. Corp., owning 100 No. La Salle Street Bldg., Chicago, pres. of Stockholders Security Co.) He was president of Beedee Management Co. located in Colorado, and became president of United Gilpin and vice president of Central City Gold Co.

Georges F. Kremm, president of Central City Gold Co., at one time.

Louis M. Seeley, employee of Beedee Co., director of Central City, and secretary and treasurer of Central City Co., tres. of United Gilpin, and treasurer of Beedee Co.

Laura O. Byron, employee of Beedee Co., on Board of United Gilpin, and of Beedee Co.

United Gilpin, organized April 22, 1935, Thibodeaux, pres., Byron, sec., and Kremm, Chairman of the Board.

Beedee Management Co., Schwerin, President, Seeley, incorporator and treasurer, A. S. Hurter, clerk, Byron, director, Thomas E. Allen, vice president.

Central City Gold Mines Co., organized July 23, 1934, by Schwerin, Seeley, and Kremm. Kremm, president.

Others not parties:

Leroy J. Williams, attorney for

Edward H. Lewison, holder of fraction of certificate of sale for labor lien in Colorado for which Kremm agreed to pay $48,000.

Public Service Co. of Colorado, joint holder of the certificate.

Herbert N. Munroe, trustee under Chain O'Mines mortgage.

Andrew S. Hurter, employee of Beedee Co.

Charles Enos, attorney for Central City and United Gilpin.

*It is fairly inferable, but proof is not clear, that it cost more than $700,000 to produce this ore.

lows: Kremm and Schwerin on May 8, 1934, entered into a conspiracy, and were later joined by Seeley, to defraud plaintiff of certain of its property; that Schwerin and Seeley knew Kremm was a stockholder and director of plaintiff, at the time the June 19, 1934 agreement was executed; that the three aforenamed defendants effectuated their scheme through the purchase of a sheriff's certificate on a labor and power lien, from Lewison and Public Service Company, and by acquiring tax deeds purchased in the name of Enos and paid for by Beedee Management Company, one of the defendants, on property of plaintiff; the scheme resulted in their acquisition of legal title on November 23, 1937, of plaintiff's property; such acquisition resulted in equity's impressing a constructive trust on the property; that United Gilpin Company, present holder of the property, holds it illegally because all mesne conveyances are tainted with the fraud and are void; that said United Gilpin Company holds the property impressed with a trust, "free from any and all liens or claims of defendants * * * and without indemnity, reimbursement or credit to such defendants for loans, contributions, advances, and for debts and liabilities incurred by said defendants, or any of them, and should be forthwith conveyed to Chain O'Mines, * * *"; that the three individuals controlled the corporate instrumentalities and used them in perpetrating their fraud; that plaintiff is entitled to an accounting of the properties and proceeds of operation and receipts; it granted a perpetual injunction; decreed equitable title in plaintiff in the real and personal property; ordered a reconveyance of the property "without indemnity, reimbursement or credit * * * for loans, contributions, advances, and for debts and liabilities incurred by said defendants."

We direct our attention first to that provision of the decree ordering a conveyance of the property involved to plaintiff, "without indemnity, reimbursement or credit * * * for loans, contributions, advances, and for debts and liabilities incurred by said defendants." Is this conclusion justifiable?

If it were to be conceded for a moment that a trust ex maleficio existed, and a court of equity properly directed the conveyance of the property, even then, such order should *not* direct the reconveyance except upon the condition that reimbursement be made to the trustee ex maleficio, of the amount which he had expended in the acquisition of the property. A trustee ex maleficio may not profit from his wrongdoing, but equity will not penalize him for contributions which are really for the benefit of the cestui.

Volume 1, Section 158 of the Restatement of the Law of Restitution provides:

"A person is entitled to specific restitution of property from another * * * only on condition that he compensate the other for expenditures with reference to the subject matter which have inured to his benefit, to the extent that justice between the parties requires."

The Comment on that section is:

"A person who discharges a lien or a tax upon property necessarily increases its net value to the owner, and ordinarily any person against whom restitution of property is sought would be entitled to credit for payments so made. Thus, in the absence of extraordinary circumstances requiring the imposition of a penalty, if a person by *fraud* obtains title to land subject to a mortgage and pays the mortgage, he is entitled to compensation for such payment upon being required to surrender the land."

Section 177 provides:

"Where the right to restitution is dependent upon restoration by the person seeking restitution, he cannot enforce a constructive trust without making restoration."

The decisions of the Supreme Court of the State of Illinois, the forum of this cause of action, are in entire accord with the rule of law contained in the above announcement. In the case of Feeney v. Runyan, 316 Ill. 246, 147 N.E. 114, it was held:

"Where deeds are set aside because of fraud arising out of a fiduciary relation which the grantee sustained to the grantor the decree should credit the grantee with any cash payment made at the time of the transaction and with principal and interest subsequently paid on notes given for the deeds and the notes should be directed to be returned to him, but he is not entitled to recover interest on the sums paid in cash."

See also, Lawson v. Hunt, 153 Ill. 232, 38 N.E. 629, and Pope v. Dapray, 176 Ill. 478, 52 N.E. 58.

Passing the ruling of the trial court directing reconveyance of the properties

without reimbursement, we are earnestly urged to review the evidence upon which the finding of fraud is based.

Defendants argue that the evidence fails to disclose fraud, or, stated in another way, all the transactions disclosed by the evidence are equally explainable on the hypothesis of legitimate and innocent motives as on the theory of fraudulent motives.

■ The rule of the Illinois Supreme Court, stated in Rubin v. Midlinsky, 321 Ill. 436, 152 N.E. 217, 219, is that a constructive trust will not be imposed except where the proof of fraud is "clear and convincing, and so strong, unequivocal, and unmistakable as to lead to but one conclusion. * * * If the explanation of the evidence may be made upon theories other than the existence of a constructive trust, such evidence is not sufficient to support a decree declaring and enforcing such trust."

■ Little may be gained by reciting in detail all the evidence upon which we predicate our conclusion that the evidence does not establish fraud. Suffice it to say that when these defendants came into the picture, the plaintiff, Chain O'Mines, was about to sink—unable to raise the money necessary to satisfy liens which were about to result in the sale of the property.

Plaintiff's central figure, Dr. Muchow, and his secretary, Miss Hart, had tried desperately and untiringly to secure contributions from the various stockholders, for a fund with which to purchase the labor-power lien certificate of the face value of $97,000, at approximately 70% of that sum. The enforcement of these liens had proceeded so far as to result in a public sale and the issuance of a sheriff's certificate.

It was at this time that Muchow approached defendant Kremm for his assistance both in raising the fund, and in negotiating a sale of the property. There was a $300,000 mortgage in default, which was subject to the lien, and nearly a hundred thousand dollars of other debts. The stockholders had, at the time of the inception of the corporation, invested large sums of money in the enterprise, and seemed extremely reluctant, if not absolutely unwilling, to make any further advancements. Had Kremm not negotiated the contract for the sale of the lienor's interest, and secured the down payment of $5,000 from his associate, Schwerin, an officer of the defendant BeeDee Management Company, it is reasonably clear that plaintiff would have failed to raise the necessary funds, and then and there would have lost the property. BeeDee Company advanced at least $12,000 more to Central City Company, and United Gilpin. Kremm advanced $500 at the very beginning, and later $60, for which he received some stock in plaintiff. He had worked many months without salary, and perhaps without even sufficient compensation to cover out-of-pocket expenses. Kremm testified that he lent the company between two and three thousand dollars, and we find no evidence which disputes this statement.

The record does not show sharply controverted fact testimony. Much of the evidence is documentary and undisputed. The most that can be said of it is that it possibly affords the basis of varied and various inferences and conclusions.

■■ Not unmindful of the rule which requires affirmance of the decree where substantial evidence exists to support it, we are also under the obligation to study the evidence and ascertain whether it is of the quantum and persuasiveness required by the law of Illinois quoted above. When we find the record consists, as here, largely of documentary proof, the duty to give it our construction, instead of accepting the views of the trial court, is clear and cannot be avoided. Uihlein v. General Electric Co., 7 Cir., 47 F.2d 997.

In reviewing and considering the oral evidence which supplements the documentary exhibits, we are at once impressed by a singularly important fact. It is uncontradicted that plaintiff sought assistance from defendant Kremm (and later Schwerin). In these preliminary negotiations it was not the defendants who sought out the plaintiff. Defendants surely were not conspirators, on fraud and deceit bent, when plaintiff, in its desperation and about to lose its property, begged for a loan or advancement from them, which it received. From thereon the story is one where these defendants carried the load which before had rested heavily upon plaintiff's managing officers. The cares and worries of a losing business venture were shifted from plaintiff's to defendants' back.

Surely there was no basis for a charge of fraud in these first transactions. If conspiracy to defraud and resulting fraud existed, it must have occurred after these first advances had been made by the defendant Kremm, and the enforcement of

the pressing liens against the property had been postponed or averted.

As we interpret the evidence the story from then on is one where hopes and realizations were far apart. There is, it is true, something alluring about gold mines and gold mine stock enterprises which arouse hopes seldom realized.

Defendants found the operation of the mines, loaded with a heavy past due mortgage and large labor and power liens, which were not only pressing but insistent, quite like plaintiff's experiences—sad and disappointing. The deeper they got in, the worse off they became. Yet the sum total of these operations resulted in the postponement of the liens and mortgage execution which meant a longer time for plaintiff and its stockholders to raise the money with which they might reclaim the property. The latter seemed, however, not disposed to venture more but to "stand by" and participate in the profits if success crowned the defendants' efforts.

It is true there is some testimony that Kremm agreed to float a two million dollar mortgage and failed to do so. Moreover, he failed to sell the property to "an English syndicate" and he utilized moving pictures and incurred expenses in endeavoring so to do. Such efforts, though futile, do not evidence fraud as much as they do good faith. Endeavoring, and even agreeing, to raise two million dollars on a gold mine property is one thing. Actually raising the money, especially in the thirties, was a vastly different matter.

It is also true defendants, with the aid of some of the plaintiff stockholders, operated the property, but without success. This was followed by operation by others. It was believed an outside organization with more experience, or at least, with assurances of such greater experience, should be utilized and it was tried. This experiment was more unfortunate than the operation by defendants or by plaintiff stockholders. All of these facts, however, seem to be more consistent with honesty and good faith than with fraud.

The same may be said of the failure to sell the property to an "English syndicate." The times (1934) were hardly favorable for such a sale—at home or abroad. The likelihood or possibility of a sale or the floatation of a large mortgage on a property which had never been profitably conducted, was pretty well known to both plaintiffs and defendants. Because

defendants failed in both efforts, provided they acted in good faith. Such failure can hardly be the basis of a fraud charge.

Defendants had advanced money and became involved deeper and deeper in the venture each year. Evidently they concluded to protect their loans and advancements. In so doing they were within their legal rights and surely outside the charges of fraud. It is our conclusion from all the evidence that it does not afford a legitimate basis for a finding that the defendants conspired to defraud or defrauded the plaintiff and its stockholders.

The decree is reversed with directions to dismiss the suit.