**BEE DEE MANAGEMENT CO. v.
KENYON.**

No. 2260.

Circuit Court of Appeals, Tenth Circuit.
Aug. 1, 1941.

Rehearing Denied Sept. 6, 1941.

Abraham W. Brussell, of Chicago, Ill. (James B. Young, of Denver, Colo., on the brief), for appellant.

Thomas K. Hudson, of Denver, Colo., for appellee.

Before PHILLIPS and BRATTON, Circuit Judges, and KENNAMER, District Judge.

PHILLIPS, Circuit Judge.

On April 29, 1938, United Gilpin Corporation[1] was adjudged a bankrupt on an involuntary petition.

On May 21, 1940, the BeeDee Management Company,[2] a corporation, filed its unsecured claim for $14,425.49. The amount was later reduced by amendment to $12,852.24.

On May 21, 1940, BeeDee filed its proof of secured claim predicated on a promissory note for the principal sum of $27,575, dated August 4, 1937, due 375 days after date, with interest at five per cent per annum from date, running to BeeDee and executed by Laura O. Byron, and secured by a deed of trust on certain mining claims, mill, machinery, and equipment situated in Gilpin County, Colorado. Byron was a clerical employee of BeeDee and an officer in Gilpin.

The referee denied the claims. On petition for review, the trial court confirmed the orders of the referee. BeeDee has appealed.

In 1934, the mortgaged property was owned by Chain O'Mines, Inc., which was then engaged in operating the property. It was indebted on certain electric power liens to the Public Service Company of Colorado[3] and on certain labor liens which had been assigned to Edward H. Lewison, in the aggregate sum of approximately $97,000. It also owed a large amount of unsecured debts. In the spring of 1934, the Public Service and Lewison obtained judgments against Chain O'Mines and on May 22, 1934, the property was sold on special execution, and Public Service and Lewison obtained a certificate of sale from the sheriff of Gilpin County. The certificate ripened into a sheriff's deed. Lewison's interest was approximately $63,000 and Public Service approximately $34,000.

On June 19, 1934, L. M. Seeley entered into a contract with Lewison to purchase his interest in the certificate of sale for $48,500, payable $5,000, June 22, 1934, $5,000, August 22, 1934, and $5,000 bimonthly thereafter until fully paid. Seeley agreed to assign the contract to a corporation to be formed. Seeley was to be relieved of personal liability after paying the first $5,000. BeeDee advanced the initial payment of $5,000 made by Seeley. On June 19, 1934, the directors of Chain O'Mines adopted a resolution approving the contract. On July 6, 1934, William H. Muchow, representing the former lessee of Chain O'Mines, who was then in actual possession of the property, delivered possession thereof to Georges F. Kremm, Seeley, and Charles L. Schwerin. On July 23, 1934, the last three named individuals incorporated Central City Gold Mines Company[4] under the laws of Colorado. Seeley assigned the contract to Central. On July 26, 1934, Central entered into a contract with Public Service to purchase its interest in the certificate of sale for $33,000, payable $1,500 in Cities Service Power and Light Company 5½ per cent debentures at par, and $1,500 monthly in such debentures at par, until the $33,000 was paid in full. Central then took over the operation of the mining property. The operations were financed largely by advances made by BeeDee. The operations were unsuccessful and Central was unable to make the payments on the contracts with Lewison and Public Service, and became in default on both contracts. On April 23, 1935, Lewison served notice upon Central and Seeley of their default in complying with the terms of his contract.

On April 30, 1935, Central assigned its contract with Public Service to BeeDee to secure advances which had been made to Central by BeeDee.

On April 22, 1935, Gilpin was organized by Kremm, Seeley, and Schwerin.

On April 30, 1935, Lewison entered into a contract to sell and transfer his interest in the property to A. S. Hurter, for a total consideration of $42,000, payable $1,500 in cash on the date of the execution of the contract, $750, June 1, 1935, $750, June 15, 1935, and $750 on the first and fifteenth of each calendar month thereafter, to and including April 15, 1936, $1,000,

---

[1] Hereinafter called Gilpin.
[2] Hereinafter called BeeDee.

[3] Hereinafter called Public Service.
[4] Hereinafter called Central.

May 1, 1936, $1,000, May 15, 1936, and $1,000 on the first and fifteenth of each calendar month thereafter until the full purchase price was paid. Hurter was comptroller of BeeDee. The initial payment of $1,500 was advanced by BeeDee.

On May 1, 1935, Hurter offered to transfer to Gilpin his interest in the contract with Lewison for 340,000 shares of stock in Gilpin and Gilpin notes for the principal sum of $49,000 due one year after date. The offer was accepted, Gilpin delivered its stock and the notes to Hurter, and the latter delivered an assignment of his contract to Gilpin. On May 1, 1935, BeeDee offered to transfer its interest in the Public Service contract to Gilpin for 9,993 shares of the common stock of Gilpin. The offer was accepted, the stock of Gilpin was delivered to BeeDee, and the latter transferred its interest in the contract to Gilpin.

Gilpin took over the operation of the property. It was unable to pay the balance due on the contracts with Lewison and the Public Service.

On January 27, 1937, BeeDee advanced $8,000 which was accepted by Lewison in payment of $18,000, balance due on the contract with him. On or about May 1, 1937, BeeDee advanced $9,000 to purchase $12,000 worth of Cities Service debentures which Public Service accepted in payment of the $17,000 balance due on its contract.

In 1936, the treasurer of Gilpin County issued sixteen tax deeds covering the property to Charles R. Enos, of Denver, Colorado. On September 29, 1936, Enos executed and delivered to Seeley a quitclaim deed of the property covered by the tax deeds. BeeDee advanced Enos $8,000 with which to purchase the tax deeds. In 1936, Seeley acquired for $2,575 additional tax deeds on the property. BeeDee advanced this amount to Seeley. The Seeley deeds were predicated on sales for taxes for the year 1935 and the Enos deeds for sales for prior years. On January 29, 1937, Seeley executed a quitclaim deed to Byron covering the property embraced in the treasurer's deeds. BeeDee entered into a contract with Gilpin to sell the tax titles to the latter within one year for $8,000 in cash and 5,000 shares of common stock on condition that Gilpin should not have outstanding more than 1,100,000 shares of common stock.

At a meeting of the board of directors of Gilpin held on July 20, 1937, a resolution was adopted which recited that Gilpin had made no payments on its contract with Public Service for more than one year and was unable to complete the payments on the contract and was threatened with loss thereof, and which authorized the officers of Gilpin to request Public Service to issue a deed to the property covered by the contract to Byron. On August 4, 1937, Byron executed to BeeDee and the public trustee the note and deed of trust on which the secured claim was predicated. On August 5, 1937, George W. Cook, assignee of Public Service, executed and delivered to Byron a deed for the property. On August 6, 1937, the board of directors of Gilpin adopted a resolution which recited that certain money had been advanced by third persons and corporations for the protection of the property, more particularly in the payment of taxes and the balance due on the Lewison and Public Service contracts; that Byron had acquired title to the property from Cook, assignee of Public Service, and from Seeley, to whom Lewison had conveyed the property; that Byron had executed the promissory note and deed of trust and had offered to deed the properties on which the secured claim was based to Gilpin in consideration of it assuming and agreeing to pay the note; and resolved that Gilpin accept the offer and deed from Byron and as a part of the consideration therefor assume and agree to pay the note.

On August 4, 1937, Byron executed and delivered to Gilpin her deed to the property. Gilpin claims title by virtue of that deed.

On November 23, 1937, Chain O'Mines commenced an action in the District Court of the United States for the Northern District of Illinois, Eastern Division, against Gilpin and others, to cancel the deed of trust. In her unverified answer in that case, Byron averred that the moneys covered by the note were advanced to Central. It was averred in the answers of Seeley, Kremm, Schwerin, and BeeDee that the note was given for a bona fide loan made by BeeDee to Gilpin.

On April 9, 1938, the Illinois Federal Court entered its decree ordering BeeDee to cancel the note and deliver it to Chain O'Mines and to cause the deed of trust to be released of record. On January 26, 1940, the Circuit Court of Appeals for the Seventh Judicial Circuit reversed the decree below with directions to dismiss the

suit. See Chain O'Mines, Inc. v. United Gilpin Corporation, 7 Cir., 109 F.2d 617.

## I. The Unsecured Claim.

The referee denied the unsecured claim on the ground that it was filed more than six months after the adjudication and was, therefore, barred by the provisions of the amendment of May 27, 1926, 44 Stat. 666, to § 57, sub. n, of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. n, in force at the time the proceedings were commenced and the claim filed.

Counsel for BeeDee assert that the pendency of the action in the Illinois Federal Court tolled the running of the statute. Section 57, sub. n, of the Bankruptcy Act, as amended by the Act of May 27, 1926, provides "Claims shall not be proved against a bankrupt estate subsequent to six months after the adjudication; or if they are liquidated by litigation and the final judgment therein is rendered within thirty days before or after the expiration of such time, then within sixty days after the rendition of such judgment."

■ The decree of the Federal District Court in Illinois did not enjoin BeeDee from prosecuting its unsecured claim against Gilpin. Nor was there any litigation pending respecting that claim. It follows that it was barred by § 57, sub. n, supra, as amended.[5]

The order denying the unsecured claim is accordingly affirmed.

## II. The Secured Claim.

The referee found that the three items which were evidenced by the note were advances made to Central, and that the note and deed of trust were given for the purpose of defrauding existing creditors.

■ In his findings the referee recited that Byron who signed the note "said it was advanced to the Central City Gold Mines Company" and that an examination of the books shows that the "testimony of Laura O. Byron is most likely the correct version." Byron did not testify in the instant proceeding. The referee evidently refers to the statement in her unverified answer in the action in the Illinois Federal Court. The answers in that proceeding were not introduced in evidence in the court below, nor are they properly before this court. The entire transcript, however, of the proceeding in the Illinois Federal Court was certified up and we have examined it for the purpose of ascertaining whether Byron at any time testified as to which corporation the moneys were advanced. We find nothing in the record except the statement in the answer.

The testimony of Schwerin in the proceeding in the Illinois Federal Court, which was introduced in evidence in the instant proceeding by counsel for the trustee, was unequivocably to the effect that $9,000 was advanced by BeeDee to purchase the debentures which were used to liquidate the contract with Public Service which had been assigned to and taken over by Gilpin; that $8,000 was advanced to pay the balance due to Lewison on the contract which had been assigned and taken over by Gilpin; and that $10,575 was advanced to acquire the tax deeds. The advances for taxes were made in 1936. Central forfeited its rights under the contracts with Lewison and Public Service in 1935. A new contract was entered into with Lewison and was assigned to Gilpin in 1935, and Gilpin acquired the Public Service contract in 1935. Gilpin was the equitable owner of the property in 1936 and, hence, the advances for taxes in that year were either for the benefit of Gilpin or to acquire the tax titles for BeeDee. The $8,-000 paid to Lewison and the $12,000 of Cities Service debentures delivered to Public Service liquidated the contracts between Gilpin and Lewison and Public Service and inured to the benefit of Gilpin. At the time those advances were made, Gilpin was in default under the contracts with Public Service and Lewison and but for those advances would have lost its rights under such contracts. The tax titles had been transferred to Byron and when she executed and delivered her deed to Gilpin, it received the benefit of the advances for taxes.

[5] Bowman v. MacPherson, 10 Cir., 93 F.2d 318, 319;

Tarbell v. Crex Carpet Co., 8 Cir., 90 F.2d 683;

In re Giera, D.C.N.Y., 12 F.Supp. 340;

In re Brill, D.C.N.Y., 52 F.2d 636, 637;

In re Richmond Hill Electrical Supply Company, Inc., D.C.N.Y., 47 F.2d 948, 949;

In re R. B. Rose Company, Inc., D.C. N.Y., 43 F.2d 446, 447;

In re Ealy et al., D.C.Mich., 31 F.2d 314, 317;

In re Silk, 2 Cir., 55 F.2d 917, 918, 919;

In re Kornblum, D.C.Minn., 22 F.Supp. 245, 247.

The foregoing facts with respect to the advances evidenced by the note were established also by the testimony of Schwerin and Tower in the instant proceeding; and Tower verified book entries in the books of BeeDee made under his supervision which reflected that in 1936, BeeDee advanced $10,575 to acquire the tax deeds, and in 1937 advanced $9,000 to liquidate the remaining liability of Gilpin to Public Service, and $8,000 to liquidate the remaining liability of Gilpin to Lewison.

■ We are not unmindful of the rule that a finding of the referee, confirmed by the trial court, if supported by substantial evidence may not be set aside by this court on appeal. But, here, we think the evidence fully establishes that the advances were made for and in behalf of Gilpin to enable Byron to acquire title to the property and to convey the same to Gilpin and that there is no substantial evidence to the contrary. Even though the unverified answer of Byron in the Illinois Federal Court were before us and could be considered, it could not be regarded as substantial evidence.

■ Counsel for the trustee contends $8,000 of the advances covered by the note were paid by BeeDee for Gilpin stock. There was evidence that BeeDee purchased from Gilpin 9,993 shares of stock for $8,000, and that $3,996.36 was expended by Gilpin to purchase Cities Service debentures of the par value of $8,000 which were applied on the contract with Public Service. At the time the $9,000 was advanced by BeeDee in 1937, to purchase Cities Service debentures of the par value of $12,000 to liquidate the balance on the Public Service contract, there was a balance due on the Public Service contract of $17,000. $16,000 had been paid on the contract. On April 20, 1935, $7,000 had been paid by Central. We think the only reasonable conclusion from the record is that the $3,996.36 was expended to purchase Cities Service debentures which were applied on the contract by Gilpin prior to the final payment of $12,000 in debentures and was a part of the $9,000 that was paid on the contract by Gilpin prior to the final payment.

■ The fact that the deed from Cook to Byron was dated August 5, 1937, and the deed of trust was dated August 4, 1937, is not of moment. The deed of trust contained full covenants of warranty and the after-acquired title inured to the benefit of the grantee therein. [6]

■ The assumption by Gilpin of the debt evidenced by the note and secured by the deed of trust was part of the consideration for which Gilpin obtained title to the property which constitutes the assets of the bankrupt estate. The deed of trust was in substance a purchase money lien. Hence, its assumption in no wise operated to defraud creditors. We conclude, therefore, that the secured claim should have been allowed.

Counsel for the trustee has advised the court that the property has been sold for a sufficient amount to pay the filing fees, costs of administration, the taxes owing by Gilpin, and all claims filed, including the secured claim. The order denying allowance of the secured claim is reversed and the matter remanded, with instructions to allow the claim in the sum of $27,575, with interest at five per cent from August 4, 1937, and to direct payment thereof from the proceeds of the sale of the property by the trustee, as and when available.

The costs will be assessed against the trustee.

[6] Lagger v. Mutual Union Loan & Bldg. Ass'n, 146 Ill. 283, 33 N.E. 946, 950;

Galloway v. Moeser, Tex.Civ.App., 82 S.W.2d 1067, 1068;

Hunter v. Taylor, 189 Ala. 104, 66 So. 671, 672;

Iowa Loan & Trust Co. v. King, 58 Iowa 598, 12 N.W. 595, 596;

Yerkes v. Hadley, 5 Dak. 324, 40 N.W. 340, 342, 343, 344, 2 L.R.A. 363.

See, also, Colorado Trout Fisheries, Inc. v. Welfenberg, 84 Colo. 592, 273 P. 17, 18.