STICHTING MAYFLOWER RECREATIONAL FONDS and Stichting Mayflower Mountain Fonds, Plaintiffs–Appellants/Cross–Appellees,

v.

NEWPARK RESOURCES, INC., Consolidated Mayflower Mines, Inc., and B.F.C. Oil Company, Defendants–Appellees/Cross–Appellants.

Nos. 88–1102, 88–1293 and 88–1387.

United States Court of Appeals, Tenth Circuit.

May 11, 1990.

---

E. Craig Smay, Sessions & Moore, Salt Lake City, Utah, for plaintiffs-appellants/cross-appellees.

Michael F. Richman, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, (David L. Arrington, with him on the brief), for defendants-appellees/cross-appellants.

Before HOLLOWAY, Chief Judge, LOGAN, Circuit Judge, and BROWN,* District Judge.

---

* Honorable Wesley E. Brown, Senior Judge, U.S. District Court for the District of Kansas, sitting by designation.

WESLEY E. BROWN, Senior District Judge.

This action concerns a dispute over rights in the "Mayflower Properties," an area of some 4,600 acres in Wasatch and Summit Counties, Utah. Plaintiffs–Appellants (hereinafter "Stichting") are developing the surface of the property for use as a resort. Defendants–Appellees have certain rights in the mineral estate of the Mayflower Properties. Stichting filed this action alleging slander of title and seeking a declaratory judgment of its rights and obligations under a 1975 mining lease. Stichting also sought quiet title to a disputed parcel of land and requested attorney's fees. Defendants filed various counterclaims.

The district court's diligent efforts to resolve the disputes and contentions of the parties resulted in the following: The district court dismissed Stichting's claim for slander of title; the court then quieted title to the disputed parcel in favor of Stichting, but held that Stichting was required to reimburse defendant Newpark to the extent that Newpark had incurred expenses for the disputed property; the court also determined the parties' rights under the 1975 mining lease and awarded both sides attorney's fees for certain claims.

On appeal, Stichting raises the following three issues: whether the court erred in requiring Stichting to pay Newpark on the quiet title claim; whether the district court misconstrued the language of the 1975 mining lease; and whether the district court erred in refusing to permit Stichting to amend its complaint to allege a claim for abuse of process. Additionally, both sides appeal the district court's award of attorney's fees.

## I. FACTS

Newpark and/or its predecessor corporations acquired the Mayflower Properties prior to 1961. The Properties included the NE¼ of Section 25 in Township 2 South, Range 4 East, Salt Lake Base and Meridian, and was the site of the Mayflower Mine from 1933 to 1972. In 1961, Newpark entered into a joint operating agreement with the Hecla Mining Company ("Hecla") re-specting the Mayflower Mine. In 1962, Hecla discovered that a portion of the surface of the NE¼ of Section 25 that was included in the joint operating agreement and which was needed for the construction of a mill had previously been sold to the Union Pacific Railroad as a portion of a railroad right-of-way. Hecla approached the Union Pacific to inquire about purchasing a 4.2 acre parcel from the railroad. This 4.2 acre parcel (described in Exhibit A attached to the district court opinion) is referred to by the parties as the "Hecla parcel." In March of 1962, Hecla advised Newpark that Hecla would buy the Hecla parcel in its own name, charge the cost of purchase to the operating account under the joint operating agreement, and thereafter convey the Hecla parcel to Newpark subject to the joint operating agreement. Hecla in fact purchased the parcel and a mill was constructed and operated on it. In 1972, the joint operating agreement was terminated. For undisclosed reasons, Hecla did not convey title to the Hecla parcel to Newpark.

In August, 1972, an individual named Leonard Lewis acquired an option to purchase the Mayflower Properties from Newpark. The option agreement described the covered properties and expressly excluded "the rights of Hecla Mining Company under the [1961 Joint] operating agreement." In September, 1972, Lewis assigned the option to LON Investment Company ("LON"). In 1972, Newpark conveyed title to the surface of the Mayflower Properties to LON by means of special warranty deeds that reserved to Newpark certain veins of minerals therein "together with the right of access to and from said veins from adjoining properties." The deeds provided that the conveyance was subject to the rights of the Hecla Mining Company under the 1961 agreement. LON had constructive notice of the fact that record title to the Hecla parcel was held by Hecla. LON executed two promissory notes in favor of Newpark as part of the purchase price and gave Newpark two mortgages on the Mayflower Properties to secure the notes. LON planned to develop the surface of the property into a resort. By

1975, LON was in arrears on its mortgage payments and LON entered into negotiations with Newpark concerning the properties. Newpark did not want to reacquire the Mayflower Properties but decided to seek sufficient surface rights in the properties to permit access for mining. Pursuant to a June 30, 1975 agreement, a new corporation—Consolidated Mayflower Mines, Inc. ("CMMI")—was formed, with Newpark owning 70 percent of the stock and LON owning 30 per cent. LON and Newpark each executed a long-term mining lease by which mineral rights in the properties were leased to CMMI.

The 1975 Mining Lease provided that CMMI had no right to use the surface of a parcel referred to by the parties as the "Village Area." The lease also placed certain restrictions on CMMI's use of the remainder of the property under the lease, which are discussed in section III of this opinion. Additionally, Newpark sought to obtain a parcel of land from LON contiguous to the old Mayflower Mine portal for use in future mining operations, but LON refused to lease any land contiguous to the portal because it was well suited for resort development. LON feared that a mining operation within this area would be unduly disruptive of its resort. LON and Newpark eventually found a parcel within the Mayflower Properties that was suitable for construction of a mining and milling operation. This parcel (referred to as the "25 Acre Parcel") was conveyed by LON to Newpark for $50,000.00.

LON continued to pursue its plans for development of a resort on the Mayflower Properties. As part of a plan to sell limited partnerships in the venture, LON had a title report prepared for the properties. The report indicated that LON's title to the NE¼ of Section 25 in Township 2 South, Range 4 East was subject to certain exceptions, one of which was the Hecla parcel. In 1977, LON decided to sell the Mayflower Properties. LON conveyed the property to Ross Lare Realty in August, 1977, who in turn conveyed it to appellant Stichting. The deed conveying the property to Ross Lare Realty and the instrument conveying the property to Stichting both excluded the Hecla Parcel. The purchase price paid by Stichting for the property did not include obtaining the Hecla Parcel.

No later than May, 1981, Stichting discovered that record title to the Hecla Parcel was held by the Hecla Mining Company. Recognizing that there were certain title defects affecting the Mayflower Properties, LON entered into an agreement with Stichting under which LON agreed to convey certain "omitted properties" to Stichting. This agreement was apparently not drafted with the Hecla Parcel in mind, however. On July 2, 1981, LON executed a Special Warranty Deed by which it conveyed to Stichting certain properties, including "all of the Grantor's right, title and interest in and to ... Section 25 ... Township 2 South, Range 4 East...." The Hecla Parcel is located in the NE¼ of Section 25. The only warranty contained in the deed was a warranty by LON that they "have not heretofore conveyed, hypothecated, or otherwise diminished any title they have had in any property conveyed hereby." The deed provided that it was made subject to the rights of the Hecla Mining Company under the 1961 operating agreement.

At the time LON conveyed the Mayflower Properties to Ross Lare Realty, the Hecla Mining Company was the record title holder to the Hecla Parcel. On various occasions between 1981 and 1984, Stichting attempted to purchase the parcel from Hecla. In May 1983, Newpark contacted Hecla to demand that Hecla convey the parcel to Newpark, asserting a right to the property under the parties' 1961 Joint Operating Agreement. Hecla initially denied that Newpark had any right to the parcel, but in 1984 Hecla agreed to convey and Newpark agreed to accept an undivided one-half interest in the Hecla Parcel. The interest was conveyed by a quitclaim deed dated March 29, 1984. Thereafter, Hecla notified both Newpark and Stichting that Hecla would sell its remaining one-half interest in the Hecla Parcel to the highest bidder. Newpark submitted a bid of $31,500.00 for the property, while Stichting bid $30,-301.00. Hecla accepted Newpark's bid and

conveyed the remaining one-half interest to B.F.C. Oil Company, a subsidiary of Newpark.[1]

In April 1984, the Wasatch County Planning Commission held hearings on Stichting's plans for resort development of the Mayflower Properties. The defendants appeared at these hearings and voiced objections to the plans, contending that the plans did not recognize their right to conduct mining operations on the property. Stichting told the Commission that under the 1975 Mining Lease, Stichting had the power to restrict all mining development on the Mayflower Property to avoid any interference with Stichting's resort plans. The defendants disputed this view of the Mining Lease.

Stichting filed this action in the district court, claiming that under the 1975 Mining Lease CMMI could not use the surface of Stichting's property without the prior written consent of Stichting. Further, Stichting maintained that CMMI was prohibited from using the surface if such use would in any way disturb Stichting's actual or contemplated use of the surface. Defendant CMMI conceded that its surface use of the lands required Stichting's consent, but argued that Stichting was required to consent if the proposed mining activity did not unreasonably interfere with plaintiff's use of the property. Both parties brought causes of action concerning the surface use of the Mayflower Properties.

## II. THE HECLA PARCEL

■ The district court found that, as to the Hecla parcel, Newpark had an equitable interest in the property in 1972 even though Hecla held the record title to the parcel. When Newpark conveyed its interest in the NE¼ of Section 25 to LON, Newpark's equitable interest in the property also passed to LON. By the Special

Warranty Deed of July 2, 1981, LON in turn conveyed all of its interest in the NE¼ of Section 25 to Stichting. This deed was effective to convey to Stichting all of LON's equitable interest in the Hecla parcel.

The district court found that when Newpark acquired record title to the Hecla parcel in 1984, Newpark held the title in a constructive trust in favor of Stichting. The court found that the defendants did not obtain the Hecla parcel fraudulently or maliciously, but ruled that the agreements between the parties contemplated that as between defendants and plaintiffs, plaintiffs would have title to the Hecla parcel.[2] The court further ruled that the plaintiffs were required by equity to pay Newpark the costs of acquiring the trust property (i.e. the Hecla parcel) to the extent such acquisition had benefitted the plaintiffs. The court found the best measure of the benefit conferred on plaintiffs to be the $30,301.00 that Stichting had bid for the Hecla parcel. Consequently, the court quieted title to the Hecla parcel in favor of Stichting and ordered them to pay Newpark $30,301.00.

Appellants first challenge the district court's order that they reimburse Newpark for Newpark's expenditures to obtain the Hecla parcel. Stichting concedes that a person who discharges a valid claim against property is normally entitled to restitution from the owner of the property.[3] Appellants object, however, to the district court's finding that Newpark's acquisition of the title to the Hecla parcel conferred a benefit upon Stichting. Stichting argues that it received no benefit from Newpark's payment because Newpark had been entitled to the parcel even when Hecla held the record title. In support of this argument, Stichting asserts that the district court

---

1. The defendants stipulated at trial that B.F.C. stood in the shoes of Newpark for purposes of determining title to the Hecla Parcel.

2. The finding of the district court that title to the Hecla property passed to Stichting by a constructive trust is not challenged on appeal.

3. This principle is expressed in the Restatement of the Law of Restitution as follows: "A person

is entitled to specific restitution of property from another ... only on condition that he compensate the other for expenditures with reference to the subject matter which have inured to his benefit, to the extent that justice between the parties requires." *Restatement on Restitution* § 158.

found that "Hecla had been merely a trustee of the millsite for Newpark ... and was, therefore, trustee for Newpark's successors." (Appellant's Brief, p. 12). Similarly, appellant asserts that "[t]here is no question, based upon the district court's findings, that had appellants been in possession of the information possessed by Newpark in 1984, it could have obtained possession of the millsite without further payment...." (*Id.* at 15). These assertions have no basis in the district court's findings and are not supported by any authority. The district court found only that Newpark, not Hecla, held the Hecla parcel in trust. Hecla denied that Newpark had a right to the parcel. Based upon an opinion of Hecla's counsel, which disclosed that the parcel had been purchased with joint funds from Hecla and Newpark, Hecla agreed to convey and Newpark agreed to accept an undivided one-half interest in the Hecla parcel to settle Newpark's claim against the property. Although Hecla had previously informed Newpark that the parcel would be transferred to Newpark, the record does not clearly establish that Newpark was lawfully entitled to the entire parcel. Because Hecla provided half of the funds needed to obtain the parcel, Hecla may have had an equitable claim on the property.[4] Accordingly, we do not find the district court's determination that Newpark conferred a benefit upon appellants to be clearly erroneous. Newpark's acquisition of the remaining one-half interest in the property had the effect of extinguishing any claim to the property by Hecla and gave appellants a clear title to the property. It was certainly not unreasonable for the district court to view the settlement of this disputed claim as a benefit to the holder of the Hecla parcel. *See Restatement*

on *Restitution* § 158 Comment a: "[T]he person obtaining restitution is ordinarily benefitted by expenditures which improve the subject matter or diminish a claim against it." Although Stichting repeatedly suggests that Newpark acted improperly in obtaining the property, the district court specifically found that "[d]efendants did not obtain the Hecla Parcel fraudulently or maliciously...." Based on the foregoing, we find that the district court did not abuse its considerable discretion to fashion an appropriate equitable remedy under the circumstances. *See e.g., McKinney v. Gannett Co., Inc.,* 817 F.2d 659, 670 (10th Cir. 1987). *See also Chain O'Mines v. United Gilpin Corporation,* 109 F.2d 617, 621 (7th Cir.1940), *cert. denied,* 311 U.S. 659, 61 S.Ct. 14, 85 L.Ed. 422. Furthermore, we find the district court's use of the $30,301.00 bid as a gauge of the benefit conferred upon Stichting to be entirely reasonable under the circumstances.

## III. THE 1975 MINING LEASE

■ The district court found that the 1975 Mining Lease contemplated a cooperative effort between LON (Stichting's predecessor in interest) and CMMI to bring about dual use of the Mayflower Properties for both resort development and mining operations. Of particular importance was the following provision of the lease:

Lessee agrees that it will not make, allow or permit any operation or activity of any type which involves any occupation or use of the Surface Premises or which would or might interfere with any actual or contemplated use of the Surface Premises by Lessor, without the prior written consent of Lessor, which will not be unreasonably withheld.

4. Stichting's contention that Hecla held the parcel in trust for Newpark is apparently based upon correspondence between Hecla and Newpark in which Hecla indicated that it intended to transfer title to the parcel to Newpark. The circumstances surrounding the acquisition of the parcel and the termination of the joint operating agreement, however, are simply too clouded to allow a conclusion that Newpark was entitled to the property outright. Under the parties' joint agreement, for example, Newpark apparently had an option to purchase Hecla's

interest in joint operation property. If the Hecla parcel was subject to the joint operating agreement, then Hecla retained an interest in the property until it was purchased by Newpark. Moreover, even if Hecla held title to the property in trust for Newpark, Hecla may have had an equitable claim on the property because it provided half of the funds needed to purchase the parcel. As such, Hecla may have been entitled to reimbursement for acquiring the trust property.

The court stated in its findings that this provision was ambiguous to the extent "it fails to define the tolerable degree of interference for which the lessor's consent could not be reasonably withheld." The court therefore relied on testimony concerning the parties' intent to determine what was required by the lease. The court found that the lease obliged the parties to cooperate in allowing both surface mining and a resort development to be conducted on the Mayflower Properties "so long as the surface mining activities do not unreasonably interfere with plaintiff's use of the surface premises for a resort development."

Appellant contends that the lease is unambiguous and that its terms prohibit any activity which would or might interfere with the resort development. Appellee maintains that the court erred in interpreting the lease as prohibiting only "unreasonable" interference.

■■■ One of the most basic rules of contract interpretation is that the intent of the parties to a written agreement is to be ascertained from the content of the instrument itself. *Hal Taylor Associates v. Unionamerica,* 657 P.2d 743 (Utah 1982); *Utah Valley Bank v. Tanner,* 636 P.2d 1060 (Utah 1981). It is only when an ambiguity exists which cannot be reconciled by an objective and reasonable interpretation of the contract as a whole that resort may be had to the use of extrinsic evidence. *Utah Valley Bank, supra.* We therefore consider the relevant portions of the 1975 Mining Lease, which provided as follows:

A. Lessor does hereby grant and lease to Lessee and Lessee does hereby take and lease from Lessor:

1. The exclusive right, subject to the provisions of paragraph I C, to enter into and upon the Leased Premises for the purpose of exploring for, developing, mining and removing all ores and minerals or products therefrom which are or may be found upon the Leased Premises, at such times, in such manner and using such methods as Lessee deems advisable.

2. The surface rights, easements and right-of-way described on Exhibit B attached hereto and made a part hereof.

B. Notwithstanding any provision in this Agreement to the contrary, it is agreed and acknowledged that Lessor or its assigns is developing the Surface Premises as a ski and recreational area and housing area, and that parts of the Surface Premises, including but not restricted to the village area described in Exhibit A, will or may be used and occupied for purposes relating to such development including, but without limitation, ski runs, tramways, lifts, multiple and single family dwellings, condominiums, stores, shops, public areas, parking areas, utilities and improvements and structures of any kind. In no event will Lessee have the right to use the land constituting the village site described in Exhibit A hereto. Any operation or activity conducted by Lessee on the Leased Premises other than the village area which interferes or might interfere with any actual or proposed use of the Surface Premises by Lessor could result in substantial damage to Lessor. The covenants and agreements herein contained relating to nondisturbance of the Surface Premises by Lessee are, therefore, substantial consideration to Lessor for the granting of this Agreement. Lessee also acknowledges that Lessor and its assigns and any third parties that become involved in the development of the Surface Premises, including parties providing financing for any part of such development, will act in reliance upon such covenants and agreements herein contained and on Lessee's part to be kept and performed.

C. Lessee agrees that it will not make, allow or permit any operation or activity of any type which involves any occupation or use of the Surface Premises or which would or might interfere with any actual or contemplated use of the Surface Premises by Lessor, without the prior written consent of Lessor, which will not be unreasonably withheld. By way of illustration and not in limitation, Lessee shall not, except as otherwise expressly set forth herein, be allowed to construct, use or occupy mill sites, drill sites, shafts, adits or portals without

Lessor's prior written consent. However, Lessor and Lessee acknowledge that in order to explore for, develop, mine and remove ores and minerals from the Leased Premises, Lessee will need to occupy and make use of a portion of the Surface Premises of areas other than the village area, and Lessor will cooperate in good faith with Lessee in permitting, without charge, said limited use of the said area.

█ There is no ambiguity in the lease as to the "tolerable degree of interference" contemplated by the parties.[5] Contractual terms are not rendered ambiguous merely because the parties to the agreement subsequently urge diverse interpretations. *Jones v. Hinkle*, 611 P.2d 733, 735 (Utah 1980). The language of the lease does not allow mining activities that would interfere with the lessor's use of the surface premises. Indeed, the district court implicitly recognized this fact when it found that the lease was unambiguous to the extent "it grants priority to resort development when these dual uses [mining and resort development] are incompatible." (Findings of Fact and Conclusions of Law p. 24.) In Paragraph I(C) of the lease, lessee agrees that "it will not permit any operation or activity of any type which ... would or might interfere with any actual or contemplated use of the Surface Premises by Lessor ..." without the consent of the lessor. The mining rights granted to the lessee are subject to Paragraph I.C of the lease. (¶ I(A)1.). That these provisions were in-

tended to prevent interference with the lessor's development of the surface is made even clearer by Paragraph I(B) of the lease, which provides:

> Any operation or activity conducted by Lessee on the Leased Premises other than the village area which interferes or might interfere could result in substantial damage to Lessor. The covenants and agreements herein relating to non-disturbance of the Surface Premises by Lessee are, therefore, substantial consideration to Lessor for the granting of this Agreement. Lessee also acknowledges that Lessor and its assigns and any third parties that become involved in the development of the Surface Premises ... will act in reliance upon such covenants and agreements herein contained and on Lessee's part to be kept and performed.

Although it is true that the lease was designed to grant the lessee rights to explore for and develop minerals in the property, those rights are subject to the limitations expressed in the lease. To the extent the district court interpreted the lease as only prohibiting interference that is "unreasonable," the court inserted a term into the agreement that the parties did not choose.[6] It must be presumed that the parties to the lease knew the effect of the words chosen and intended them to have their ordinary meaning. *Cf. Tomino v. Greater Park City Co.*, 570 P.2d 698, 701 (Utah 1977).

The lease allows the lessor to determine in the first instance whether a proposed mining activity "would or might" interfere

---

5. The fact that "interference" is not defined in the lease does not make the lease ambiguous. Whether a proposed activity would "interfere" amounts to a factual issue, just as whether an activity would "unreasonably interfere" is a factual issue.

6. We think the district court's initial reading of the lease was correct. After arguments on May 8, 1987, the court stated from the bench:

> Now, I don't know that the lease is that difficult, counsel. It seems to me, based on how the court views this, that the defendant does have a right to go on to the surface for the purpose of developing and extracting the minerals within the limitation provided by the lease. I don't know that I would go so far as to agree with Mr. Richman that they may do so if the development or extraction does not

exceed a reasonable interference with the contemplated—either the use—actual use or contemplated use of the surface. I think the lease says they may do so so long as it does not interfere with any actual or contemplated use of the surface premise. I think the lease is clear in that regard, counsel. I think in order to do so there must be prior written consent of the plaintiff which will not be unreasonably withheld. * * * But my reading of the lease and language would be that the lease does allow exploration, that is to go on to the site and explore without charge. And that would not be unreasonably withheld so long as it does not interfere with the surface use being made or contemplated being made by plaintiff. I don't know that it is more difficult than that, counsel.

with lessor's actual or contemplated use of the surface. In making this determination the lessor is bound to act reasonably, since consent "will not be unreasonably withheld." The "reasonable" provision in this sentence applies to the lessor's determination of whether an activity is allowed by the lease; it does not amend the preceding clause to allow "reasonable" interference with the surface premises. Similarly, the lessor promises to cooperate in good faith with lessee in permitting "said limited use" of the surface premises. The "limited use" of the premises means those activities allowed by the first sentence of Paragraph I(C)—activities that do not interfere with the lessor's use of the surface.

Insofar as the judgment below allows mining activities that would or might interfere with Stichting's actual or contemplated use of the surface premises covered by the lease, the judgment of the district court must be reversed and remanded for further findings consistent with this opinion.[7]

### IV. ATTORNEY'S FEES

#### A. The 1975 Mining Lease

■ Paragraph XIX(C) of the 1975 Mining Lease provides: "In the event of any dispute between the parties hereto, the prevailing party shall be entitled to recover reasonable attorney's fees...." In its findings, the district court stated that neither party was a prevailing party under Paragraph XIX(C) of the lease. The district court awarded attorney's fees to the defendants as the prevailing party, however, on plaintiff's seventh cause of action, a claim for royalties allegedly due under the lease. Appellant argues that this

award of fees is inconsistent with the court's finding that neither party was the prevailing party. We agree and reverse the award of attorney's fees on the seventh cause of action.

■ Because our interpretation of the lease provisions relating to surface rights differs from that of the district court, we find it necessary to remand the case for a redetermination of who, if anyone, is the prevailing party. In order to guide the district court's determination, we make two observations. First, in making its determination of the prevailing party, the district court should consider only those claims involving disputes under the mining lease.[8] *Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984) (A party is entitled only to those fees attributable to the successful vindication of contractual rights within the terms of their agreement.) Second, under the contract language at issue here, there can generally be only one "prevailing party." *Mountain States Broadcasting Co. v. Neale*, 783 P.2d 551, 556 (Utah App.1989); *Cf. Trayner v. Crawford*, 688 P.2d 856, 858 (Utah 1984). Because the contract disputes in this case all arose out of the same transaction, the court should consider all of the contract claims together in making a determination of who is the prevailing party. In other words, the court should first attempt to apply the "net judgment rule" rather than award fees on each individual claim.[9] *See Mountain States*, 783 P.2d at 556 n. 8.

#### B. Costs

■ Stichting also objects to the award of costs other than attorney's fees to the defendants. We note that the taxing

7. The parties do not challenge the district court's findings as to the parties' rights in the village area or the 25 acre parcel purchased by defendants. The district court's findings on those issues are affirmed.

8. Thus, the only claims relevant to this determination are both parties' claims for declaratory relief, the plaintiffs' claim for royalties, and the defendants' claim for breach of contract.

9. We recognize the difficulty of applying a "net" rule in the context of multiple claims and actions for declaratory relief. Nevertheless, the *Mountain States* decision indicates a preference for such a rule, and we think the district court

should attempt to weigh the relative success of the parties on the contract claims if it can find a reasoned basis for doing so. One possibility, for example, is to determine whether one party prevailed on the most significant issues underlying the dispute. The net judgment rule need not be mechanically applied, though, and *Mountain States* recognizes the need for a "flexible and reasoned approach" to deciding in particular cases who actually is the prevailing party. *Id.* at 556 n. 7. This flexible approach implies that the district court's assessment will be given due deference upon review.

of costs is a matter on which the trial court is given broad discretion. *U.S. Industries, Inc. v. Touche Ross & Company*, 854 F.2d 1223, 1245 (10th Cir.1988). Because our opinion alters the relief obtained by the parties to some degree, on remand the district court should exercise its discretion and determine what, if any, changes should be made to the original assessment of costs.

### C. Quiet Title Claim

■ In a cross-appeal, Newpark challenges the award of attorney's fees to Stichting on its quiet title claim. The district court recognized the lack of authority for such an award, but found that Stichting was equitably entitled to attorney's fees for having to litigate the title to the Hecla parcel.

We agree with Newpark that this award is not supported by authority. Utah adheres to the "American rule" with regard to attorney's fees under which, as a general rule, each party bears his or her own attorney's fees in the absence of a statute or enforceable contract provision to the contrary. *Cobabe v. Crawford*, 780 P.2d 834, 836 (Utah App.1989). Although there may be several equitable exceptions to this rule,[10] Stichting has cited no authority that would support an award of attorney's fees under the circumstances of this case. *Cf. South Sanpitch Co. v. Pack*, 765 P.2d 1279 (Utah App.1989) (Attorney's fees are recoverable under the "third party tort rule," where the negligence of one defendant causes plaintiff to incur attorney's fees quieting title as to a third person.) Accordingly, the award of attorney's fees on the quiet title claim is reversed. *See Lyman Grazing Association v. Smith*, 24 Utah 2d 443, 473 P.2d 905, 908 (1970) (Record did not support an award of attorney's fees to a party who was forced to procure a restraining order; the court will not award such fees in the absence of a showing of such fraud, malice or wantonness as would authorize an award of punitive damages.)

### V. ABUSE OF PROCESS

In its complaint, Stichting asserted a claim for slander of title. Stichting maintained that the defendants made false statements to the Wasatch County Planning Commission during the course of density hearings on the Mayflower Properties. The district court granted the defendants' motion for summary judgment on this issue, finding that the defendants' statements were privileged statements made by witnesses in a quasi-judicial proceeding. This ruling is not challenged on appeal. After the motion for summary judgment was granted, however, Stichting filed a motion seeking leave to amend the complaint to change the theory of their claim from slander of title to abuse of process. The district court found that there was no evidence of an abuse of process.[11]

■ The determination of whether to grant or deny leave to amend the complaint is within the discretion of the trial court and is subject to reversal only for an abuse of that discretion. *Leaseamerica Corp. v. Eckel*, 710 F.2d 1470, 1473 (10th Cir.1983). In this case, the motion to amend was filed two years after the suit was initiated, after the completion of discovery, and shortly before the trial was scheduled to begin. It came in the wake of a motion, hearing, and ruling on the defendants' request for summary judgment on the slander of title claim. These circumstances do not warrant a finding of abuse of discretion. *Cf. Franks v. Nimmo*, 796 F.2d 1230, 1238 n. 4 (10th Cir.1986). Moreover, even if we were to find error in the district court's ruling, the error would be harmless because the district court's findings preclude a claim for abuse of process. Under a section of the 1975 Mining Lease entitled "Zoning and Land Use," the parties agreed to cooperate in obtaining and maintaining zoning and land use laws to allow the activities contemplated by the lease. Although plaintiff contends that the

---

**10.** *See Turtle Management v. Haggis Management*, 645 P.2d 667, 671 n. 1 (Utah 1982).

**11.** The court also stated that the absolute privilege for testimony given in a judicial proceeding barred the abuse of process claim. In view of our disposition of the claim for abuse of process, we do not address this issue.

defendants' bad faith use of the zoning hearings in Wasatch County constituted an abuse of process, the district court found after hearing the evidence that "[t]here has been no breach by either plaintiffs or defendants of an express or implied duty under the 1975 Mining Lease to cooperate in good faith." (Findings of Fact and Conclusions of Law, p. 27). This finding is supported by substantial evidence in the record. It precludes appellant's argument that Newpark used the zoning hearings for an improper purpose. Accordingly, the district court's ruling on this issue is affirmed.

## VI. CONCLUSION

The order requiring Stichting to pay $30,-301.00 to defendants for reimbursement is affirmed. On the parties' claims for declaratory relief, the judgment of the district court is reversed and the matter is remanded for further findings consistent with this opinion. Likewise, the judgment as to attorney's fees is reversed and remanded for further findings consistent with this opinion. The district court's ruling on the claim for abuse of process is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.