UNITED STATES of America, Plaintiff–Appellee,

v.

CONSOLIDATED MAYFLOWER MINES, INC., Defendant– Appellant,

Stichting Mayflower Mountain Fonds and Stichting Mayflower Recreational Fonds, Defendants–Intervenors–Appellees,

and

18.57 Acres Land, more or less located in Central Wasatch County, State of Utah, Defendant.

UNITED STATES of America, Plaintiff–Appellee,

v.

18.57 ACRES OF LAND, more or less located in Central Wasatch County, State of Utah, Defendant,

and

Consolidated Mayflower Mines, Inc., Defendant–Appellee,

Stichting Mayflower Mountain Fonds, Stichting Mayflower Recreational Fonds, Defendants–Intervenors–Appellants.

Nos. 93–4138, 93–4151.

United States Court of Appeals, Tenth Circuit.

July 24, 1995.

E. Scott Savage (Patrick J. O'Hara, with him on the brief), Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, for defendant Consolidated Mayflower Mines, Inc.

E. Craig Smay, Salt Lake City, UT, for defendants Stichting Mayflower Mountain Fonds and Stichting Mayflower Recreational Fonds.

Joan M. Pepin, U.S. Dept. of Justice, Washington, DC (Lois J. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Washington, DC, Scott M. Matheson, Jr., U.S. Atty. for Dist. of Utah, Salt Lake City, UT, Stephen J. Sorenson, Asst. U.S. Atty. for Dist. of Utah, Salt Lake City, UT, Jacques B. Gelin and Eric G. Williams, U.S. Dept. of Justice, Washington, DC, with her on the brief), for plaintiff.

Before TACHA, FAIRCHILD,* and LOGAN, Circuit Judges.

FAIRCHILD, Senior Circuit Judge.

These appeals, argued the same day, arise from a condemnation trial.[1] The government, pursuant to its power of eminent domain, took 18.22 acres of land, except subsurface minerals, owned by Consolidated Mayflower Mines, Inc. ("CMMI"), for relocation of United States Highway 40 and a natural gas pipeline due to construction of a dam and reservoir near Heber City, Utah. The taking date was March 22, 1988. The parties agreed that the land was worth $67,500, if valued for development as recreational home

---

* The Honorable Thomas E. Fairchild, Senior Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

1. While not formally consolidated, we choose to deal with both appeals, reflected in the above caption, in a single opinion.

sites. CMMI claimed, however, that the highest and best use was as a staging area for access to and operation of the Mayflower Mine, to which CMMI has rights under mining leases. The jury found that the highest and best use of the land was for development as recreational home sites, rather than as a mine staging area. That meant that just compensation was $67,500, the amount conceded by the government. CMMI appeals from the judgment entered accordingly (No. 93–4138). Stichting Mayflower Mountain Fonds and Stichting Mayflower Recreational Fonds ("the Stichtings"), intervenors below, are successors to one of CMMI's lessors. On their appeal (No. 93–4151), they challenge limitations the district court placed on the issues they could present at the trial. We affirm.

## I.

The 18.22 acres[2] were part of a larger parcel of land, made up of 25.08 acres ("the 25 acres"), and owned in fee simple, excluding mineral rights, by CMMI. CMMI also had, under long-term leases, the exclusive right to mine and remove all ores and minerals from 4600 acres owned by the Stichtings and surrounding the 25 acres. The entire area is within lands known as the Park City Mining District.

The principal bone of contention is the underground Mayflower Mine located within the 4600 acres. Discovered in the late 1800s, it produced gold and other minerals until 1972. It was then owned by Newpark Resources. In 1972, Newpark removed and sold trackage, equipment, and pumps; the Mine flooded.[3]

In 1972, Newpark sold the 4,600 acres to LON Investment Company, which planned to develop a ski resort on the property. Newpark reserved some of the mineral rights. The old portal to the Mine was on and surrounded by the land sold to LON; no other access to the Mayflower Mine has been created.

In 1975, Newpark and LON created CMMI (now a wholly-owned subsidiary of Newpark), and each issued a mining lease to CMMI, giving it the exclusive right to mine their properties. They conveyed the 25 acres to CMMI, evidently as a staging area for mining. The Stichtings obtained LON's properties in December 1977, for resort development. They, therefore, stand as lessor of CMMI's mineral rights, and owner of the 4,600 acres, including the old portal. Pursuant to the mining lease between CMMI and LON (now the Stichtings), the Stichtings were entitled to a 0.6% royalty on net smelter returns for minerals mined. The Stichtings also could withhold consent for CMMI activity which would or might interfere with the surface use.[4] This background is more fully recounted in the opinion in *Stichting Mayflower v. Newpark Resources*, 917 F.2d 1239 (10th Cir.1990).

Operation of the Mayflower Mine could be accomplished most economically through the old portal, owned by the Stichtings. They do not permit its use. There was evidence that possible alternative points of access, other than the 25 acres, and including the nearby Ontario Mine, are not feasible.

In simplistic terms, Mayflower Mine consists of a vertical shaft from at or near the surface to a depth of 3,000 feet, with drifts and raises branching off. The adit (often

---

**2.** The 18.22 acres are made up of 17.41 acres of surface estate in fee, and .81 acres in a perpetual slope easement. After taking, CMMI's remainder is 6.86 acres and the fee interest in the .81 acres, subject to the easement.

**3.** The 1971 Newpark annual report stated that ore research data showed that the mine is approaching the end of profitable ore production, and that there would be an end to profitable mining operations during the third quarter of 1972. The 1972 annual report stated that ore reserves were depleted to a point where profitable operations could no longer be sustained.

The price of gold was $64.00 per ounce at the end of 1972. At the time of taking, it was $443.00 per ounce.

**4.** The lease provided that

Lessee agrees that it will not make, allow or permit any operation or activity of any type which involves any occupation or use of the Surface Premises or which would or might interfere with any actual or contemplated use of the Surface Premises by Lessor, without the prior written consent of Lessor, which will not be unreasonably withheld.

referred to as a tunnel) from the old portal reaches the shaft 800 feet below its top. The adit is about 7,000 feet in length.

At trial, Mr. Miller, an experienced mining engineer, produced a plan for working the Mayflower Mine from the 25 acres. A new adit would be driven from a new portal on the 25 acres, about 1,800 feet, passing under an area known as the Village Site, and would intersect the old adit about 300 feet from the old portal. The elevation of the new portal would be 6,360 feet above sea level, and the new adit would have to be graded to rise 80 feet in order to intersect with the old adit.

The mine had flooded, with water in the shaft pretty well up to the old adit. Mr. Miller described how the new adit would be driven, buildings built on the 25 acres, pumps installed so as to remove an estimated 150 million gallons of water, plus normal accumulation thereafter, trackage, hoist, and equipment replaced, and electric power brought in. A road would be prepared for hauling ore to a mill (which would be installed at a distance of 7.9 miles), and a pipeline laid to carry water about two miles to a treatment facility. The preliminary work would take 18 months. Production, with a work force of 70, would start then, and continue for 3½ years.

Mr. Simos, who had been head geologist at the Mayflower Mine when operating, testified that in 1988 there were 175,000 tons of ore which would be profitable to mine at the then gold price of $443.00 per ounce, cost of operation being taken into consideration. Mr. Miller calculated that that amount of ore could have been produced under the plan. He estimated that $32 million would have been received for ore during the 3½ years, $6,100,000.00 would have been spent as capital over the first 1½ years. Total cost of operation, and cost of shutdown would be $20,256,000, yielding a net return of $5,644,000, over the period of operation.

Mr. Stuart, a retired accountant, testified to an opinion that the fair market value of the Mine was $8 million. His opinion was based on his estimates of interest on borrowings and Mr. Miller's estimates of the capital requirements, costs, and receipts for the 175,000 tons of ore. He computed the present value (1988) of cash flows over the five-year period at $3.522 million. It was difficult to find sales of comparable properties. In an effort to come as close as possible to comparables, he looked at 31 sale or acquisition transactions in 1987 and 1988 involving companies related to gold-mining. He narrowed these down to 20 and then pared them down to eight or nine that he thought were most comparable where the properties were working mines. In most instances, only a fractional interest in a gold mine had been acquired, but he calculated the amount paid for each dollar of revenue. He ultimately computed three types of multipliers and derived values, based on Mr. Miller's figures, of 57.8 million dollars, 28.1 million dollars, and 53.5 million dollars. He considered these high and gave the average of them only 10% weight. He gave the 3.522 million dollars derived from the income approach 90% weight and thus reached his final opinion of a market value of 8 million dollars.

The government produced evidence to show that carrying out Mr. Miller's plan would ultimately result in loss of some of the initial capital outlay. Mr. Bohnet is a mining engineer with experience in underground mines and in preparing feasibility studies for mining projects. He had gone over Mr. Miller's plan and testified to items where he believed Mr. Miller had allowed an inadequate amount, such as for dewatering the mine, had omitted needed equipment, such as air conditioning for the hot portions of the mine, had proposed equipment inadequate to perform the needed function, such as an eight inch pipeline for dewatering where a 12 inch diameter was needed. He estimated the required capital outlay at $10,440,270.00. He also believed that operating cost would amount to $116.20 per ton instead of Miller's $73.50 per ton, and felt there would be less revenue because the declining grade of ore would result in less recovery of gold per ton. He testified that according to his figures, the return from 175,000 tons of ore would be greater than the cost of operating the mine, but would not pay back the capital required to begin operation.

He also testified that large companies look for gold mines with a potential of 500,000

ounces of gold. The Mayflower was expected to produce from 50,000 to 75,000 ounces.

William Pincus, a government witness, is manager of the mineral economics department of a consulting firm. He is a geologist, with experience in the mining industry. He testified that serious investors in the mining business tend to have a conservative approach because of the risk. Large mining companies want big projects, and would not be interested in the Mayflower Mine, because it is small. With a short proven reserve life, a flooded mine in an environmentally sensitive area, not in production for 15 years, it would be characterized as a high risk project, and conventional bank financing would be unlikely. Mr. Pincus testified that in his opinion, the project is clearly uneconomic. He used a gold price of $443.00 per ounce, the price at the date of taking. The industry standard at this time, however, was $400.00.

Mr. Pincus computed that the project would have lost $7,369,000 if carried out.

A different, major consideration, adverse to any buyer's interest in the 25 acres, was brought before the jury, in part by the government, and in part by the Stichtings. It was that CMMI's right to conduct mine operations might require the Stichtings' consent and that the Stichtings were unwilling to give consent. As put by government counsel in his opening statement:

> ... [O]ne factor that a willing buyer in the market as of 1988 ... would be that if anyone tried actually to mine from that property in 1988, they would face a legal hornet's nest from the [Stichtings].

> Who's right and who's wrong in that issue really doesn't matter ...; the point is a buyer would know that that extra expense and delay would be part of developing that property for mining....

Although the lease provided CMMI with the right to remove ores in such manner as CMMI deems advisable, its right was subject to restrictions which would make its operations dependent to some extent upon the Stichtings. See portions of the lease, quoted *Stichting*, 917 F.2d at 1246–47. Parts of the amended judgment entered on remand of

that litigation provide that whenever lessors reasonably believe that a proposed mining use would or might interfere with actual or contemplated resort uses, they may refuse consent; lessee may contest the refusal on the ground that it was unreasonable; in order to prevail, lessee must show that the use proposed cannot interfere with any actual or contemplated resort use; lessee may not use or occupy an area described as the "Village Site."

Mr. Mower, the manager of the United States operations for the Stichtings from 1980 to 1988, testified that the Stichtings would not have consented to the proposed adit, pipeline, or road beneath or across their property because these would or might interfere with the resort development they contemplated.

Additionally, the adit, as proposed, would have run beneath the Village Site, referred to in the lease. The Stichtings contend that, properly interpreted, the provision that the lessee shall have no right to use the Village Site applies to its subterranean dimension as well as the surface. Tunnelling under it would thus be unconditionally forbidden, and they would argue that the provision against unreasonably withholding consent would not apply.

Thus there is support for the government's assertion that a hypothetical buyer at the time of taking would have evaluated the difficulties and probable outcome of a lawsuit, as well as the capital outlay and costs and returns of the mining operation itself.

Other objective evidence tending to show that reopening the Mayflower Mine could be profitable was that in April, 1981, Newpark made agreements with Noranda Mining Company, of Canada, to resume operations. For purposes of the agreements, the mining property was valued at $6 million. The agreements were canceled, however, when Noranda withdrew from all United States operations. The Noranda agreement, however, has little probative value in this case because it was based on gaining access from the old portal, and not the 25 acres. The required capital outlay is about $1.5 million less if the old portal can be used. There have been negotiations between CMMI and

the Stichtings about the use of the old portal and the area giving access to it, but those negotiations have been unsuccessful.

The issues were submitted to the jury by special verdict. Question 1 asked the jury to indicate by check-mark whether the highest and best use of the 25 acres was development as recreational homesites or development as a mining staging area. The jury checked the former, and then, as instructed, did not answer the other questions. Had the jury found that a mining staging area was the highest and best use, Question 2 asked whether, after the taking of the 18.22 acres, it would have been just as possible and practicable to develop a staging area on the remaining 6.86 acres (as the government had contended). If not, Questions 3, 4, and 5 asked the fair market value of the 25 acres before the taking, the fair market value of the remaining 6.86 acres after the taking, and the difference between those amounts.

## II. APPEAL NO. 93-4138

CMMI seeks a new trial, arguing that part of an instruction on highest and best use was erroneous, and that CMMI was prejudiced by activity of counsel for intervenor Stichtings, going beyond any legitimate purpose of intervention.

### A. *Jury Instruction on Highest and Best Use*

The court instructed the jury that

fair market value in this case is to be regarded by you as that sum of money which considering all of the circumstances existing on March 22nd, 1988 probably could have been obtained for the property on the open market, that is the amount in terms of cash or its equivalent that in all probability would have been paid for the property after fair negotiations between a fully informed owner willing to sell and a fully informed purchaser willing and able to buy, with neither being under any compulsion to act and a reasonable time being allowed for negotiations. The same defini-

tion applies to the fair market value of the property which remains after the taking.

Now to determine the property's fair market value, you should consider its highest and best use. This means you should find how a fully informed purchaser in the marketplace would most likely use it *in the reasonably near future after March 22, 1988* without the government's taking.

The land's highest and best use must be shown by substantial credible evidence to have been reasonably *probable* in the reasonably *near* future. *Mere possibility of a use is not enough. Speculative schemes of the owner or witnesses are to be excluded from your consideration.*

Jan. 27, 1993 Tr. at 235–236 (emphasis added).

The significance of the instruction defining highest and best use is made clear by the form of the verdict. Unless the jury found that the highest and best use was development as a mining staging area, the jury would never reach the question of market value.

CMMI takes issue with the italicized portions of the instruction. CMMI had objected to them at the end of the trial,[5] and had requested an instruction based on *Cal–Bay Corporation v. United States*, 169 F.2d 15, 18 n. 2 (9th Cir.), *cert. denied*, 335 U.S. 859, 69 S.Ct. 134, 93 L.Ed. 406 (1948). That instruction would not have required a finding of probable mining in the reasonably near future, but would have told the jury that "[w]here there is reasonable possibility of production in paying quantities [mining] leases are common subject of barter and sale and, therefore, have a definite ascertainable market value."

■ "We review the jury instructions as a whole, in light of the record, to determine whether they correctly state the applicable law and provide the jury with ample understanding of the issues and standards of the case." *Shamrock Drilling Fluids, Inc. v. Miller*, 32 F.3d 455, 459 (10th Cir.1994) (internal quotation marks and citations omit-

---

5. We note that CMMI did not object to a similar preliminary instruction which was earlier given to the jury.

ted). We will reverse the district court only if, after reviewing the record, we determine that an instructional error was prejudicial. *F.D.I.C. v. United Pacific Ins. Co.*, 20 F.3d 1070, 1077 (10th Cir.1994).

■ The dispute concerning the instruction narrows down to whether, where land taken has access to valuable minerals, not yet developed, the owner cannot have the value of the minerals reflected in the fair market value unless he can show that the extraction of the minerals is the highest and best use of the land and would have been reasonably probable in the reasonably near future. Or would it be enough to show a reasonable possibility of production in paying quantities?

The *reasonably probable in the reasonably near future* requirement is derived from *Olson v. United States,* 292 U.S. 246, 255, 257, 54 S.Ct. 704, 708–09, 709, 78 L.Ed. 1236 (1934). *Olson* asserted that the highest and most profitable use is to be considered in determining just compensation. *Olson,* and many of the cases which apply its holding, did not involve evaluation of mineral deposits underlying the land being taken. *See McCandless v. United States,* 298 U.S. 342, 345, 348, 56 S.Ct. 764, 765–66, 766, 80 L.Ed. 1205 (1936); *United States ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 275–76, 63 S.Ct. 1047, 1052–53, 87 L.Ed. 1390 (1943); *Wilson v. United States,* 350 F.2d 901, 908 (10th Cir.1965); *United States v. 46,672.96 Acres of Land, More or Less, etc.,* 521 F.2d 13, 15 (10th Cir.1975); *U.S. v. 77,819.10 Acres of Land More or Less, etc.,* 647 F.2d 104, 110 (10th Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 441 (1982).

CMMI does not appear to have objected to the form of the special verdict, which made a finding that mining was the highest and best use a condition precedent to any further consideration of market value. Indeed, in its answer, it had alleged that providing surface mining access for its leasehold mineral interests was the highest and best use of the 25 acres. The Pretrial Order stated that CMMI and the Stichtings assert that the highest and best use of the property was for mining purposes. CMMI, however, argues on appeal:

The undue emphasis placed by the lower court on the challenged highest and best use instruction was improper in this case. The improper instruction obscured the proper measure of just compensation: market value. The jury was directed away from the market for the taken property and required to narrowly focus upon whether mining from that property was reasonably probable in the near future.

CMMI brief in No. 93–4138, p. 19.

CMMI is essentially contending that the *Olson* standard for considering a use not yet undertaken must be relaxed where the use is the extraction of minerals. In support, CMMI cites *Montana Railway Co. v. Warren,* 137 U.S. 348, 353, 11 S.Ct. 96, 97, 34 L.Ed. 681 (1890). There the Supreme Court approved an award based on opinion testimony as to the value of a relatively undeveloped mining claim through which the land being taken ran. The Court said,

It may be conceded that there is some element of uncertainty in this testimony; but it was the best of which, in the nature of things, the case was susceptible. That this mining claim, which may be called 'only a prospect,' had a value fairly denominated a market value, may, as the Supreme Court of Montana well says, be affirmed from the fact that such 'prospects' are the constant subject of barter and sale. Until there has been full exploiting of the vein its value is not certain, and there is an element of speculation, it must be conceded, in any estimate thereof. And yet, uncertain and speculative as it is, such 'prospect' has a market value; and the absence of certainty is not a matter of which the railroad company can take advantage, when it seeks to enforce a sale.

As recently as 1989, the Court cited *Montana Railway* as recognizing that the difficulty in appraising mineral rights does not defeat the existence of a market value in them. *ASARCO, Inc. v. Kadish,* 490 U.S. 605, 628 n. 3, 109 S.Ct. 2037, 2051 n. 3, 104 L.Ed.2d 696 (1989).

Several Courts of Appeals, including this one, have supported an award of market value, based on underlying gas, oil, or minerals, without requiring the owner to show that

extraction was the highest and best use, or a reasonable probability that it would begin in the reasonably near future. *Eagle Lake Improvement Co. v. United States,* 141 F.2d 562, 564 (5th Cir.1944) ("where oil interests are involved, ... where there is a reasonable possibility of production in paying quantities, mineral rights are a common subject of barter and sale, and therefore have a definite, ascertainable market value, even where the prospects of successful development are too speculative and remote to be 'reasonably probable.'"); *Cal–Bay Corporation v. United States,* 169 F.2d 15, 18–19 (9th Cir.), *cert. denied,* 335 U.S. 859, 69 S.Ct. 134, 93 L.Ed. 406 (1948) (error to refuse instruction "that in the determination of the value of gas and oil leases, it may be based on the reasonable *possibility* of production in paying quantities, even though there were not a reasonable *probability* shown of such value"); *Phillips v. United States,* 243 F.2d 1, 3, 6 (9th Cir.1957) (error to assume that appellant was entitled to payment only on the basis of highest and best use; error to foreclose appellant from making proof as to either possibility or probability of mineral deposits); *United States v. Silver Queen Mining Company,* 285 F.2d 506, 510 (10th Cir.1960) (some speculation inherent in the ascertainment of value of all resource property).

In two cases, this court has approved applying the *Olson* test before considering the value of the extraction of minerals. In *United States v. 494.10 Acres of Land in Cowley Cty.,* 592 F.2d 1130 (10th Cir.1979), the government took farmland with sand and gravel under it. A Commission decided that the highest and best use was agriculture and other surface uses. It assigned no value to the gravel deposits. This court approved, citing *Olson,* and saying, "The 'reasonably likely to take place in the near future' element of use is significant here. It is apparent that if the 'future' is beyond or very much beyond the 'near future,' the use becomes speculative." *Id.* 1132. *See U.S. v. 179.26 Acres of Land in Douglas Cty., Kan.,* 644 F.2d 367, 368 (10th Cir.1981) (Commission found that highest and best use was that of commercial quarry and livestock and grain production; consideration of limestone reserves held not clearly erroneous). *See also*

*U.S. v. 69.1 Acres of Land,* 942 F.2d 290 (4th Cir.1991) (finding that highest and best use was commercial and mining was not clearly erroneous; reasonably-near-future means near enough to affect the current value).

There seems to be some tension between the *Olson* requirement of reasonable probability of use in the reasonably near future, when applied to future extraction of mineral deposits, and the line of cases based on *Montana Railway,* permitting valuation of underlying minerals where there is a reasonable possibility of production in paying quantities. We conclude, however, that *United States v. 494.10 Acres* resolved any tension in this circuit, adopted the *Olson* requirement, and requires our approval of the instruction given in this case.

We note also our view that the difference between the instruction given and one requiring only a reasonable possibility would not, in this case, have produced a different verdict. As we read the record, the testimony of CMMI's witnesses, if fully credited, would establish that producing a profit by reopening the Mayflower Mine from the 25 acres was both possible and probable, but the testimony of government witnesses would establish that a profitable outcome was not even possible. That was the principal thrust of the government's closing argument, and if the jury's finding on highest and best use was not based on acceptance of government testimony, it would have been based, as argued by the Stichtings, on the view that mining was not practicable without consent by them. Nothing suggests that the jury believed that production at a profit was possible, but probably would not have occurred within the reasonably near future.

### B. CMMI's Challenge to the Role Played by the Stichtings

The lease which gave CMMI the right to mine also gave the Stichtings the right to a royalty on mining production. If CMMI obtained an award reflecting the value of minerals it could have mined but for the taking of the 18.22 acres, a portion of the award commensurate with the royalty would belong to the Stichtings. The court allowed

the Stichtings to intervene as defendants, understandably without objection. They could have protected their right to an apportionment representing the royalty and could, if they saw fit, have joined in advocating an appropriate award. The district court made it clear that the apportionment would be decided by the court.

On motion of the government, the court limited the Stichtings to presentation of evidence relevant to the fair market value of their royalty interest. Later, they were permitted also to prove that they would have feared adverse effects from the mining and would not have consented to the construction of the adit, roadway, and pipeline which would have been involved in reopening the mine from a portal on the 25 acres. Their counsel's cross-examination of witnesses was generally of a sort adverse to an award to CMMI and closing argument to the jury was in a similar vein. Generally, they took a position favorable to the government, although not formally aligned with it.

CMMI correctly notes: "This was not a quiet title action or a declaratory judgment action by the lessee against the lessor under the lease to challenge the reasonableness of the Royalty Holder's refusal to consent to a specific mining plan. This was an action to determine just compensation." Brief, p. 45. The Stichtings' counsel's rhetoric often sounded as if he were seeking an injunction against a mining operation about to begin.

CMMI contends that the Stichtings' "double-teaming" with the government made a fair trial impossible.

We have considerable sympathy with counsel's frustration. It has been difficult for us on appeal to understand the reasoning and approach of the Stichtings' counsel. We think it was an abuse of discretion to permit him to go beyond the limit the court originally set. Nevertheless, we do not agree that CMMI was deprived of a fair trial. The evidence that the Stichtings would not have consented to the adit, pipeline, and roadway was relevant to whether the 25 acres could have been used as a staging area, and doubtless would have been introduced by the government if not by the Stichtings. We see no basis for concluding that the presence of counsel for nominal defendants in addition to counsel for the government, or the fact that he offered evidence or argued against the feasibility of the mining plan unfairly influenced the jury on the issue of highest and best use.

As noted, the government had by motion sought to keep the Stichtings' counsel within bounds, and there is no basis for any claim of complicity.

### III.  APPEAL NO. 93–4151

■ The Stichtings claim that the district court improperly eliminated their "claim for compensation other than a royalty." They say that the court forbade them to produce evidence that CMMI's mining lease "was not workable without further consents" from them, and that "such further consents could have been available in exchange for a larger share of proceeds of mining." Brief, p. 2.

They say they made it "clear that if CMMI claimed proceeds of a mining operation which utilized interests in intervenors' lands which CMMI had no existing right to use, intervenors, if they consented to such mining operations at all, would not do so for the royalty under the Mining Lease, but would claim a larger share of the proceeds of mining." Brief, p. 6. Although they assert "[t]he Pretrial Order was drawn to reflect such a broadened claim," we do not find it there.

Their theory of why they could, in this proceeding, seek to recover more than the existing lease would give them, seems to have been: "Intervenors' mineral estate in the Mayflower Property, and part of their surface estate, were united in use with CMMI's 25 Acres and mineral interest. Intervenors were entitled to claim any loss of value of their properties united in use with the 25 Acres, resulting from the taking of the 25 Acres." Brief, p. 10. They also argue that they were given standing in this proceeding because the government had taken part of their surface estate for the Highway 40 project, the subject of a different proceeding. They cite no authority specifically dealing with this type of claim.

We think their standing in this proceeding was limited to protecting their royalty inter-

est. In any event, the outcome of possible negotiations with CMMI over modification of the lease and the extent of any "larger share" was speculative and represented a loss of an opportunity rather than property. The exclusion of such evidence was correct. *United States ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 281–82, 63 S.Ct. 1047, 1055–56, 87 L.Ed. 1390 (1943), *United States v. Sowards,* 370 F.2d 87, 89 (10th Cir.1966).

The judgment appealed from is **AFFIRMED.**