**Laurie FITZGERALD and Aaron Hazard, Plaintiffs–Appellees,**

v.

**The MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY d/b/a U.S. West Communications, Inc., Defendant–Appellant.**

**No. 93–1142.**

United States Court of Appeals, Tenth Circuit.

Oct. 27, 1995.

Kathryn E. Miller, Miller & Steiert, Littleton, Colorado, Doris B. Truhlar and Robert J. Truhlar, Truhlar & Truhlar, Littleton, Colorado, for Plaintiffs–Appellees.

Jerry R. Atencio, U.S. West, Denver, Colorado, for Defendant–Appellant.

Before BRORBY, SETH, and KELLY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Defendant-appellant, The Mountain States Telephone & Telegraph Company d/b/a U.S. West Communications, Inc. (hereinafter U.S. West) appeals from the denial of its post-trial motion seeking a new trial on the issue of damages, or remittitur.[1] U.S. West contends that the jury award in this action for race discrimination under 42 U.S.C. § 1981 was the result of passion or prejudice, that the jury should not have been allowed to consider punitive damages, and the jury should have been instructed that unreimbursed expenses should be deducted from any compensatory award for lost profits. At trial, U.S. West twice sought judgment as a matter of law that punitive damages were not supported by the evidence, see Fed.R.Civ.P. 50(a); *Ruyle v. Continental Oil Co.*, 44 F.3d 837, 841 (10th Cir.1994), *cert. denied*, — U.S. —, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995), and made specific objection concerning a net profits instruction in accordance with the district court's procedure, see Fed. R.Civ.P. 51; *Abercrombie v. Osteopathic Hosp. Founders Assn.*, 950 F.2d 676, 679–80 (10th Cir.1991). *See* Amend.Aplt.App. 828–30, 1046–49. Though the relief requested is more limited than might be requested, U.S. West has preserved error. Our jurisdiction arises under 28 U.S.C. § 1291. We agree with U.S. West on these issues and therefore reverse for a new trial on the issue of damages as outlined in this opinion and for dismissal of the punitive damage claims.

## Background

Plaintiffs Laurie Fitzgerald, a white female, and Aaron Hazard, a black male, claim that U.S. West discriminated against each of them based on their color or race by not entering into contracts with them as diversity trainers. In February 1989, Plaintiffs, as agents of The Consultancy, Inc., responded to U.S. West's request for proposal (RFP) to provide diversity training to U.S. West employees. They urged that their proposal be accepted, though one day late. In March 1989, Plaintiffs' proposal was accepted on the condition of successful completion of a five-day "Train the Trainer" program. The purpose of the program was to "learn the workshop material, demonstrate your awareness of the nine dimensions of diversity,[2] and demonstrate your facilitation skills." Amend.Aplt.App. 126. Upon successful completion of the program, U.S. West indicated that it would contract with various consultant groups for approximately six three-day workshops per year over three years. *Id.* A prerequisite to subsequent workshops, however, was certification by U.S. West after the first workshop.

Facilitating the training session attended by Plaintiffs and several others were independent contractors Dr. Tom Gordon and Marilyn Loden, both highly experienced in the field. After the session, U.S. West terminated its contract with Dr. Gordon and Ms. Loden. They were joined by U.S. West employee Debra Sapp, also experienced. Dr. Gordon and Ms. Sapp are black; Ms. Loden is white. Before the program began, Ms. Sapp had a very cordial dinner with several program participants including Plaintiffs. Amend.Aplt.App. 681. The difficulty began the next day. Program participants were asked to recount an experience which led them to this type of work. Plaintiff Fitzgerald discussed her romantic involvement with a black man and how the relationship was ending due to "the pressure of the black community of Denver." Amend.Aplt.App. 686–87. She told of incidents which illustrated this pressure and blamed in large part "the racial intolerance that the black community in Denver could not see the love that we had for each other and the value in our relationship and wouldn't allow it to happen." *Id.* at 687. From this point forward, Ms.

1. After a member of the original panel recused, we vacated our prior opinion, *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 46 F.3d 1034 (10th Cir.1995), on Plaintiffs' motion. *See* 60 F.3d 837, 1995 WL 414835 (10th Cir. July 14, 1995) (unpub. order). The case was resubmitted on the briefs and accompanying pleadings, including the recording of the oral argument.

2. The nine dimensions of diversity include "race, ethnic origin, age, gender, physical abilities, religious beliefs, sexual/affectional orientation, work background experience, and education." Amend.Aplt.App. 126.

Sapp was hostile to Plaintiff Fitzgerald and made the training session more difficult for her. Although accounts differ,[3] Plaintiff Fitzgerald testified that when evaluating her, Ms. Sapp said "You white bitches are always taking up the air time, and I'm sick of it." *Id.* at 706–07. Ms. Sapp continued her mean-spirited treatment of Plaintiff Fitzgerald throughout the week. Although the other facilitators, Dr. Gordon and Ms. Loden, had reservations about Ms. Sapp's conduct toward Plaintiff Fitzgerald, they did not inform U.S. West at the time and they voted against Plaintiff Fitzgerald continuing in the program. Amend.Aplt.App. 1148 (Dr. Gordon depo.); Aplee.Supp.App. 69 (Loden depo.). Unlike any other participant, Plaintiff Fitzgerald was placed in a "Services Not Needed" category and dismissed from the program. Ms. Sapp then told Plaintiff Hazard that he would receive diversity training contracts if he divorced himself from Plaintiff Fitzgerald. He was unwilling to do this.

A few days later, Plaintiff Fitzgerald wrote to a U.S. West official about the problem, but the intended official had transferred. She described the offensive remark made by Ms. Sapp as "You white women are always trying to take all the air time and I'm sick of it." Aplees.Supp.App. 8. Her complaints were twofold: (1) Ms. Sapp violated group confidentiality by discussing her personal opinions of Plaintiff Fitzgerald with other program participants, and (2) Ms. Sapp had not provided feedback "but a racial/gender stereotype and a personal issue that Debra apparently has not yet worked through." Plaintiff Fitzgerald requested another opportunity for training and to "be evaluated by someone who is not working personal issues and can therefore see me and my abilities through fewer filters."

After one month without response, Plaintiff Fitzgerald wrote another letter to the CEO of U.S. West, with which she included a copy of her first letter. These letters were turned over to the management training director, Jan Fincher, who met with Ms.

Sapp's supervisor, Ann Welter, as well as with Ms. Sapp. Ms. Welter and Ms. Sapp then contacted the other facilitators, Dr. Gordon and Ms. Loden, who indicated that they "agreed to go along" with Ms. Sapp's decision on Plaintiff Fitzgerald. Aplees. Supp.App. 73. The training director also received reports from some of the program participants. Thereafter, U.S. West wrote Plaintiff Fitzgerald, explained its investigation, concluded that there was "no evidence to support your allegations of racial or gender-based discrimination" and reaffirmed its "initial position that your particular skills and facilitation style, and our expectations regarding the facilitation of this particular workshop, are not compatible." *Id.* at 17–18. Further attempts to dissuade U.S. West were unavailing. In anticipation of litigation, U.S. West did not give Plaintiff Hazard a contract, although he had successfully completed the training.

After a six-day trial against U.S. West as the sole defendant, the jury found against U.S. West on liability and awarded Plaintiff Fitzgerald $535,000 and Plaintiff Hazard $310,000 in economic damages. Each Plaintiff also was awarded $250,000 for emotional distress damages, and $500,000 in punitive damages. Thus, the jury awarded $2,345,000 to Plaintiffs, $1,285,000 to Plaintiff Fitzgerald and $1,060,000 to Plaintiff Hazard.

### Discussion

 Federal law governs damages in civil rights cases. 42 U.S.C. § 1988; *Garrick v. City and County of Denver*, 652 F.2d 969, 971 (10th Cir.1981). We review for an abuse of discretion the district court's decision to not grant a new trial, or remittitur, on the grounds of excessive damages. *Garrick*, 652 F.2d at 971. "[A]bsent an award so excessive as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial, the jury's determination of the damages is considered inviolate."

---

**3.** We review the evidence in the light most favorable to the prevailing Plaintiffs on the record presented. The liability evidence sharply conflicted. Ms. Sapp testified that Plaintiff Fitzgerald was not allowed to continue because she did not demonstrate proper understanding of the material, specifically sexism, did not listen to feedback, and was overly defensive when challenged. Amend.Aplt.App. 949–50.

*Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1168 (10th Cir.1981) (en banc) (citations omitted), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Plainly excessive damages, however, may support an inference that bias, passion or prejudice contributed to the award. *Wells v. Colorado College,* 478 F.2d 158, 162 (10th Cir.1973). Whether sufficient evidence exists to support punitive damages is a question of law reviewed de novo, *Mason v. Texaco,* 948 F.2d 1546, 1560 (10th Cir. 1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992). Our review of a challenged jury instruction is de novo, against a backdrop of the jury instructions as a whole and the entire record. *United States v. Consolidated Mayflower Mines, Inc.,* 60 F.3d 1470, 1475–76 (10th Cir.1995). Reversal is warranted only where a deficient jury instruction is prejudicial. *Id.* We address these claims in inverse order.

### A. Jury Instruction

Plaintiffs sought compensatory damages based upon the denial of opportunity to enter training contracts with U.S. West. Both Plaintiffs testified that they had consulting businesses in various years. In computing taxable income, substantial expenses were deducted from revenues. Amend.Aplt.App. 412–416 (Hazard); 754–66 (Fitzgerald). Plaintiff Fitzgerald incorporated her business in 1987 and filed corporate tax returns. *Id.* at 758. Plaintiff Hazard admitted to expenses he would incur had he left salaried employment for full-time consulting. *Id.* 409–10. Although U.S. West would reimburse travel expenses, there was evidence of other expenses and the jury was not instructed that the economic loss recoverable was revenue less expenses, or net profits.

■■■■ We may look to state law on this issue because it involves a determination of contract loss, and the state rule will serve the federal policy. *See Sullivan v. Little Hunting Park,* 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). Colorado law is quite clear that only net profits are recoverable. *Lee v. Durango Music,* 355 P.2d 1083, 1088 (Colo.1960); *Graphic Directions, Inc. v. Bush,* 862 P.2d 1020, 1024 (Colo.1993). Evi-

dence of past profits "is highly relevant to the issue of lost profits." *Western Cities Broadcasting v. Schueller,* 849 P.2d 44, 49 (Colo.1993) ("Damages for lost profits 'have their foundation in the past experience of the concern said to have suffered the loss.'") (quoting *Durango Music,* 355 P.2d at 1087)). Although the district court allowed the parties to argue the issue of expenses, the arguments of counsel cannot substitute for proper instruction on the issue.

### B. Punitive Damages

■■■■ Title 42 U.S.C. § 1981 proscribes public or private racial discrimination in the formation and enforcement of contracts. *Runyon v. McCrary,* 427 U.S. 160, 173–75, 96 S.Ct. 2586, 2595–97, 49 L.Ed.2d 415 (1976). During the incident in question, § 1981 did not apply to post-formation conduct not interfering with the right to enforce established contracts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989). Pertinent to this case, "[t]he statute prohibits, when based on race, the refusal to enter into a contract with someone, as well as the offer to make a contract only on discriminatory terms." *Id.* at 176–77, 109 S.Ct. at 2372. Liability under § 1981 requires proof of intentional discrimination. *General Building Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982).

■■■ Plaintiffs sued U.S. West based upon the actions of Ms. Sapp during the "Train the Trainer" program; they did not advance an independent theory of liability against U.S. West based upon the investigation conducted by U.S. West in response to Plaintiff Fitzgerald's letter complaint. Amend.Aplt.App. 1–4 (complaint); 11 (pretrial order); 41–43 (jury instructions, plaintiffs' claims); 57–60 (jury instructions; elements of 42 U.S.C. § 1981). Applying the doctrine of respondeat superior to this § 1981 action, *General Building Contractors Ass'n,* 458 U.S. at 392, 102 S.Ct. at 3150–51, an employer would be responsible only "for those intentional wrongs of his employees that are committed in furtherance of the employment; the tortfeasing employee must think (however misguidedly) that he is doing the employer's business in committing

the wrong." *Hunter v. Allis–Chalmers Corp. Engine Div.,* 797 F.2d 1417, 1421–22 (7th Cir.1986). We have held that "[a]n employer is liable under both Title VII and section 1981 'where the action complained of was that of a supervisor, authorized to hire, fire, discipline or promote, or at least to participate in or recommend such actions, even though what the supervisor is said to have done violates company policy.'" *EEOC v. Gaddis,* 733 F.2d 1373, 1380 (10th Cir. 1984) (quoting *Miller v. Bank of America,* 600 F.2d 211, 213 (9th Cir.1979)). Although Ms. Sapp was not a supervisor, we believe that her actions may be attributed to U.S. West for purposes of compensatory damages, given her role in the selection process of trainers. Punitive damages based solely on a respondeat superior theory are quite another matter.

At the outset, we have doubt about whether the district court submitted the punitive damages instruction pursuant to respondeat superior or direct (independent) liability, the latter having not been raised in the pleadings. *See Magnum Foods, Inc. v. Continental Cas. Co.,* 36 F.3d 1491, 1499–1502 (10th Cir.1994) (instructions indicated that corporation held liable for its own negligence, not merely respondeat superior). On objection by U.S. West to the instruction, Plaintiffs advanced an independent liability theory for the first time: "We think there is considerable evidence of a deliberate disregard by U.S. West through its agents to properly investigate and resolve this matter." Amend.Aplt.App. 1049. The district court decided to give the instruction, but acknowledged "I think there really are questions," and indicated that later reconsideration, and perhaps the striking of such damages, might be appropriate, if necessary. *Id.*

■ The federal standard in this circuit for imposition of punitive damages in civil rights cases requires "that the discrimination must have been 'malicious, willful, and in gross disregard of [plaintiff's] rights.'" *Jackson v. Pool Mortgage Co.,* 868 F.2d 1178, 1181 (10th Cir.1989) (quoting *Gaddis,* 733 F.2d at 1380). Any intentional discriminatory conduct in this case occurred at the hands of Ms. Sapp, not U.S. West. Ms. Sapp is not

a party-defendant, and no evidence indicates that U.S. West took part in any intentional discriminatory conduct. *See Gaddis,* 733 F.2d at 1380 (employer may be held liable for punitive damages under § 1981 where employer took part in intentional discrimination). Thus, we must look at when the law allows punitive damages against a corporate employer given conduct by an employee. *Restatement (Second) of Torts,* § 909 (1979) provides guidance:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
>
> (a) the principal or a managerial agent authorized the doing and manner of the act, or
>
> (b) the agent was unfit and the principal or managerial agent was reckless in employing or retaining him, or
>
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
>
> (d) the principal or a managerial agent of the principal ratified or approved the act.

*See also Restatement (Second) of Agency* § 217C (1958). No pleading or proof indicates that U.S. West authorized Ms. Sapp's intentional discrimination or negligently hired or retained her. No pleading alleges that Ms. Sapp functioned in a managerial capacity or that U.S. West ratified her intentional discrimination.

■ Turning to the evidence, although Ms. Sapp testified she was a "manager in U.S. West" with a title of "training instructor," Amend.Aplt.App. 864, we look at the stature and authority of the agent to exercise control, discretion and independent judgment over a certain area of a business with some power to set policy for the company. *See Mattingly, Inc. v. Beatrice Foods Co.,* 835 F.2d 1547, 1565 (10th Cir.1987) (citing *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 698, 620 P.2d 141, 148 (Cal.1979)), *vacated on other grounds,* 852 F.2d 516 (10th Cir.1988); *Malandris,* 703 F.2d at 1176 (jury could draw inference of "some managerial participation in wanton and reckless handling of the transactions"). According to these standards, Ms. Sapp is

not a manager with the type of authority necessary to impose vicarious liability on an employer for punitive damages. Ms. Sapp was not in charge of management training, let alone diversity training; she was a diversity trainer asked to co-facilitate this session in the absence of another. Amend.Aplt.App. 868. While she may have had the final say (in consultation with the other facilitators) of whether a candidate in this session would advance to the certification stage, and thereafter be awarded diversity training contracts, she did not have the typical discretion of a manager, such as the power to make independent decisions regarding personnel matters or determine policy.

Nor does any evidence indicate that U.S. West ratified or approved Ms. Sapp's discriminatory conduct. Plaintiffs suggest that the "act" is really the decision not to give contracts to the Plaintiffs, not the discrimination itself, and, therefore, that U.S. West ratified Ms. Sapp's act. It is not so simple. The only act which could give rise to punitive damages would be intentional discrimination in refusing to contract. Here, U.S. West conducted an investigation in an effort to determine the facts on controverted evidence, and reasonably concluded that discrimination had *not* occurred and, with that understanding, rejected Plaintiff Fitzgerald's complaints. For ratification or approval to occur on vicarious liability, the principal must have knowledge of the facts. *Restatement (Second) of Torts* § 909, comments (a) & (b). There must be some conduct indicating assent to those known facts. *See, e.g., Restatement (Second) of Agency* § 217C comment (b). U.S. West cannot be charged with the knowledge of the facts based on the outcome of the jury trial occurring many years later.

As noted, upon closer inspection of the record, we do not believe that Plaintiffs adequately presented a theory of independent liability against U.S. West for punitive damages based on the alleged inadequacy of the investigation. Regardless, the record will not support such a theory. The director of management training considered Plaintiff Fitzgerald's charges of discrimination "very serious;" she followed her normal procedure by contacting the responsible manager and conducting an investigation. Amend. Aplt.App. 1000. Plaintiffs fault the investigation because Ms. Sapp was involved and Plaintiff Fitzgerald was not contacted. In any investigation, Ms. Sapp would have been involved; she had personal knowledge of the events and was the accused. The fact that she worked with Ann Welter does not automatically taint Ms. Welter. Finally, Ms. Fitzgerald provided full details of the incident in a lengthy letter. While the investigation may not have been procedurally perfect, the substantive evidence elicited involved disputed matters on which Ms. Fincher was required to exercise judgment. Ms. Fincher was aware of the issues and had corroborating evidence with which to support her decision. The procedure employed is not the sort of willful and wanton conduct attendant to racial discrimination that would support punitive damages.

### C. Economic Damages

Although damages for lost business opportunities need not be supported by mathematical certainty, they must be based on reasonable proof. Amounts that are "speculative, remote, imaginary, or impossible of ascertainment" are not recoverable. *Western Cities Broadcasting*, 849 P.2d at 48–50. The economic damages in this case are excessive given the proof and perhaps attributable to the subject matter of the trial, which we discuss below.

According to Plaintiffs, "[i]t appears that the jury awarded both Mr. Hazard and Ms. Fitzgerald $310,000 in damages from lost U.S. West contracts. And, in addition, Ms. Fitzgerald appears to have received $225,000 for losing the FBI contract." Aplees.Answer Br. 21.

The letter from U.S. West offered six three-day workshops per year upon successful completion of the training session. Additionally, once the training session had been successfully completed, trainers had to be certified at their first workshop. Amend. Aplt.App. 568. Thus, at $4,500 per workshop over a period of three years, the maximum each Plaintiff would have received was $81,-000. Plaintiff Hazard claimed lost earnings of $729,000 based on three workshops per

month for fifty-four months; Plaintiff Fitzgerald claimed an amount one-half as large based on one-half the number of workshops due to her other commitments. *See* Amend. Aplt.App. 336–338, 721. Each claimed that they also would have received work from other departments at U.S. West as a result of this engagement. No other participant who completed the training received anywhere near the amounts requested or awarded; earnings ranged from a low of $6,000 to a high of $202,500. *Id.* at 127. That is not surprising given that scheduling was based on several variables such as availability, geographic location and background. Moreover, appraisal was ongoing and twenty-two others competed for the work. As for the outside work that would be generated, that too falls into the zone of speculation and conjecture.

Each of the Plaintiffs had other professional commitments. At the time of the training, Plaintiff Hazard worked at Digital Equipment Corp., but after perceived discrimination regarding an unawarded promotion, he went on disability leave for stress and ultimately took a job at Boeing. At Boeing, he was a "one-person department, as such" and it would have been difficult for him to get away for blocks of time. Amend.Aplt.App. 397. Plaintiff Fitzgerald planned on doing one-and-a-half sessions per month.

Plaintiff Fitzgerald also contends that she lost a diversity training contract with the FBI valued at $225,000. However, after the U.S. West training session, Plaintiff Fitzgerald and a partner conducted two workshops for the FBI and were paid $6,600. *Id.* at 752. She also successfully competed for training contracts after the U.S. West Training Session.

Plaintiff Fitzgerald testified about an agreement to complete a pilot program for the FBI. While she was presenting the pilot program, one of the participants began to attack the *concepts* and she had "a flashback to the May workshop, where people and other people were joining in, were attacking me." Amend.Aplt.App. 725. She could not continue. Not only is causation extremely attenuated because U.S. West is not responsible for the conduct of the other participants in the FBI pilot program, but the damages

are predicated on the assumption that her pilot program would have been approved competitively, even had the incident not occurred.

The damages in this case are a product of speculation fueled by passion and prejudice; the most the jury should have been allowed to consider was $81,000 per plaintiff.

### D. Emotional Damages

■ Plaintiffs were each awarded $250,000 in emotional distress damages. No treating physicians or psychologists testified and both Plaintiffs continue to work in their chosen field. Plaintiff Fitzgerald testified to a hostile environment that left her devastated, her dignity stripped away, and her ability to conduct diversity training in doubt. Amend.Aplt.App. 715, 726–27. A clinical psychologist, hired to conduct an evaluation and testify, and who practiced an "insight-oriented talking therapy," repeated these accounts and thought the incident would have continuing effects. Amend.Aplt.App. 508–09. She acknowledged that Plaintiff Fitzgerald's stressful romantic relationship, including the drug dependence of Plaintiff Fitzgerald's male companion, could "have a very serious effect" on her, however. Plaintiff Fitzgerald also testified that she had more frequent recurrences of stress-related herpes simplex for eight months following the incident and obtained stronger medication from her doctor. Finally, she testified that she was gaining perspective with the help of a friend who was a psychotherapist. *Id.* at 727.

Plaintiff Hazard testified that he felt angry and insulted, experienced headaches and missed more than three weeks of work. *Id.* at 335. He felt that he had been denied his right to association. *Id.* at 336. He had similar symptoms when he was not promoted at Digital based on what he perceived as discrimination. *Id.* at 402–06.

Particularly in reviewing the damages for emotional distress, we think that it is essential to place the training session in context. Plaintiffs were experienced diversity trainers; much of the testimony in this case concerns Plaintiffs' pedagogical criticisms of the training sessions, rather than racial discrimi-

nation. Although Plaintiff Hazard requested some ground rules for the sessions such as confidentiality, honesty, feedback, and a few others which could not be recalled, no evidence indicates that every member of the group had a common understanding and agreed to be bound. Amend.Aplt.App. 315.

Equally prominent in the record are the comments and reactions of the other participants (other than Ms. Sapp) to the Plaintiffs. These remarks, though at times hostile to the Plaintiffs, cannot sustain damages awarded against U.S. West on the basis of respondeat superior liability for Ms. Sapp.

It does not appear that insensitive remarks were completely the province of Ms. Sapp. Plaintiffs' expert, Dr. Jones testified that Plaintiff Fitzgerald's opening story contained a component which would cause him to "have a question about that person having racist feelings:"

> I think there was a real significant component of Laurie Fitzgerald's story that had to do with her blaming black women, which I think—has a lot more vol—potential volatility associated with it than just the fact that she was in a relationship with a black man.

*Id.* at 550. Indeed, several of the participants reacted negatively to Plaintiff Fitzgerald's story, despite her later disclaimer that she was not angry at black women. *See* Aplees.Supp.App. 38 ("There were several participants that were also upset by Laurie's own comments, and they also, many of them remained upset with her throughout the week.") (Dr. Gordon depo.); Aplt. Amend.App. 862 ("When she [Plaintiff Fitzgerald] was relating that story, I felt she was showing a great deal of anger towards black women.") (Swinnerton testimony).

According to the testimony, diversity training sessions generate conflict and emotion in hopes of fostering better communication and dissipation of conflict. *Id.* at 380. Plaintiff Hazard testified that "there was more emotion and more conflict in the Train the Trainer session than any such session [he] had ever attended before." *Id.* U.S. West's responsibility in § 1981 damages may not be attributed to the insensitive or intemperate remarks of the other training session partici-

pants, who were encouraged to be candid. This is an action to determine liability for racial discrimination in the awarding of contracts; it is not a referendum on the citizenship of the participants, or the quality of the training session.

Without question, racial prejudice in the awarding of the training contracts by Ms. Sapp will support damages. Although two psychologists, Aplees.Supp.App. 11–16, as well as Plaintiff Hazard, Amend.Aplt.App. 320–21, offered explanations of why *some* black women often are hostile to white women, this cannot excuse racial discrimination. On deposition, Dr. Gordon put it best:

> I cannot say that we are perfect beings and we would not react and certain things wouldn't upset us. But part of what you expect from a professional, is to manage your reactions much better than Debra Sapp managed hers.

Aplees.Supp.App. 29. While the record may support a compensatory damage award, we believe that all damages awarded in this case are a product of passion and prejudice. The emotional distress damages clearly are excessive. *See Wulf v. City of Wichita*, 883 F.2d 842, 875 (10th Cir.1989). The record shows that the incendiary climate of the training session originated from a variety of sources, many completely beyond the control of U.S. West and Ms. Sapp. Diversity training is perhaps a tyranny of virtue, but the "hot button" issues involved in this case appear to have resulted in damage awards tainted by passion and prejudice.

On remand, the district court shall dismiss the punitive damage claims of each plaintiff against U.S. West and then conduct a new trial on compensatory damages. *See Williams v. Missouri Pac. R.R.*, 11 F.3d 132, 135–36 (10th Cir.1993) (new trial on compensatory damages).

REVERSED.