## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 97-10685
_____

JULIE DEFFENBAUGH-WILLIAMS,

Plaintiff-Appellee-Cross-Appellant,

versus

WAL-MART STORES, INC., Et Al.,

Defendants,

WAL-MART STORES, INC.,

Defendant-Appellant-Cross-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

August 31, 1999

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Our en banc court, 1999 WL 528486, having reinstated our prior opinion, 156 F.3d 581 (1998), except for part II. C. (punitive damages), *id*. at 592-98, at issue on remand is whether the recently-clarified standard for such Title VII damages, *Kolstad v. American Dental Association*, 119 S. Ct. 2118 (1999), requires a new trial on that issue or supports the district court's judgment as a matter of law for Wal-Mart. We **REVERSE** and **REMAND** for

reinstatement of the punitive damages award for Julie Deffenbaugh-Williams (Deffenbaugh), but reduced to $75,000.

I.

The relevant facts, 156 F.3d at 585-86, are established by the reinstated affirmance of the jury verdict for Deffenbaugh on liability and compensatory damages.

Dale Gipson, district manager over the shoe and jewelry departments in six Wal-Mart stores, left uncontradicted, during an August 1993 lunch meeting between him, Deffenbaugh, and two other Wal-Mart managers, the statement by Deffenbaugh's prior supervisor (a district manager) that Deffenbaugh would "never move up with the company being associated with a black man". Subsequently, Gipson became Deffenbaugh's supervisor. He pursued a series of pretextual disciplinary actions against Deffenbaugh, finally terminating her in January 1994 on fabricated workplace-policy grounds.

Signs in Wal-Mart stores encouraged employees with grievances to contact higher management. Subsequent to one of the pre-termination disciplinary episodes, Deffenbaugh complained to Wal-Mart regional manager David Norman that her supervisors were "out to get" her because of, *inter alia*, her interracial relationship. Norman responded that her dating a black man was not a problem *and* that he would "check into it". But, Norman did not contact Deffenbaugh about any follow-up.

**2**

Deffenbaugh filed suit under Title VII, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1981.  On 25 July 1996, four days before her trial, ***Patterson v. P.H.P. Healthcare Corp.***, 90 F.3d 927 (5th Cir. 1996), was rendered.  It addressed in some detail what level of management must participate in an action in order to assess Title VII punitive damages against an employer, particularly stressing the relevance and importance of a properly-functioning anti-discrimination policy for an employer's lack of "malice or ... reckless indifference to the federally protected rights of an aggrieved individual", the 42 U.S.C. § 1981a(b)(1) Title VII punitive-damages touchstones.

However, ***Patterson*** went unmentioned during the trial, held from 29 to 31 July, including during the charge conference, held 31 July.  Wal-Mart rested on 31 July without presenting any evidence (Wal-Mart personnel, including Gipson, had been called by Deffenbaugh).

The jury found that Wal-Mart had discriminated against Deffenbaugh based on her race; and, pursuant to bare-bones instructions on corporate vicarious liability and the § 1981a(b)(1) criteria (unobjected to by Wal-Mart), that Wal-Mart had done so with malice or with reckless indifference to Deffenbaugh's federally protected rights.  The jury awarded $19,000 compensatory and $100,000 punitive damages.

While Wal-Mart's post-verdict motion for judgment as a matter of law (JMOL) or for a new trial was pending, *Patterson*'s applicability was finally raised. Following supplemental briefing, and relying on *Patterson*, the district court granted a JMOL to Wal-Mart on punitive, but not compensatory, damages.

Wal-Mart and Deffenbaugh each appealed. In June 1998, just prior to oral argument, *Burlington Industries, Inc. v. Ellerth*, 118 S. Ct. 2257 (1998), and *Faragher v. Boca Raton*, 118 S. Ct. 2275 (1998), clarified vicarious liability in the context of Title VII sexual harassment; our panel ordered post-argument briefing on these cases' effect.

Our first opinion, in September 1998, affirmed liability and the compensatory damages, rejecting, *inter alia*, Wal-Mart's contention that discrimination on the basis of an interracial relationship is not Title VII race discrimination. 156 F.3d at 586-91. We reversed the post-verdict JMOL on punitive damages, *id.* at 592-94, but found the jury's award excessive, and ordered a remittitur to $75,000, *id.* at 594-98.

In November 1998, the Supreme Court granted certiorari in *Kolstad* to consider when punitive damages may be awarded under Title VII, the principal focus being whether, despite its plain terms, § 1981a(b)(1) could be satisfied only if the discriminatory conduct was also "egregious". 119 S. Ct. 401 (1998); *id.* at 2127 (1999); *id.* at 2132-33 (Stevens, J., concurring in part and

**4**

dissenting in part). Concomitantly, our en banc court granted rehearing in this case in February 1999, 169 F.3d 215, and ordered additional briefing on the punitive damages issue and *Kolstad*'s possible effect. The EEOC participated in briefing and oral argument. Prior to, and at, the en banc oral argument in May 1999, Deffenbaugh stipulated to accepting the reduced punitive damages.[1]

*Kolstad* was rendered in June 1999. As discussed *infra*, after rejecting an egregiousness element, the Court addressed imputing liability to an employer, if its employee was found to have acted with the requisite malice or reckless indifference. 119 S. Ct. at 2126. Four Justices dissented from the Court's reaching the imputation issue. *Id*. at 2130 (Stevens, J., concurring in part and dissenting in part).

*Kolstad* having lighted the way for when Title VII punitive damages liability can be imputed to the employer, our en banc court, in short order, reinstated our prior panel opinion, except its punitive damages section, and remanded to our panel to consider *Kolstad*'s impact. 1999 WL 528486. Therefore, the $19,000 compensatory damages award has again been affirmed. We directed the parties, and invited the EEOC (it accepted), to brief the

---

[1]In her post-remand, supplemental brief, however, Deffenbaugh requests a new trial on punitive damages should we reinstate the remittitur but should she then refuse it. No authority need be cited that, on grounds of judicial estoppel, among other bases, she is bound by her earlier stipulation.

effect of **Kolstad**, particularly whether a new trial on punitive damages is necessary.

## II.

In the post-**Kolstad** briefing, Deffenbaugh and the EEOC urge that such remand is not necessary; that the JMOL again be reversed. Wal-Mart takes a different procedural course: it urges remand; alternatively, that the JMOL be affirmed.

## A.

**Kolstad** explains, first, that no "egregiousness" requirement exists for § 1981a(b)(1) punitive damages beyond the statutory "malice" or "reckless disregard" regarding actions' legality under Title VII. 119 S. Ct. at 2123-26. Second, **Kolstad** adopts Restatement (Second) of Agency § 217C for imputing liability for punitive damages; they are available against a principal only when, *inter alia*, an agent employed in a managerial capacity acts in the scope of employment. 119 S. Ct. at 2126-29. But, pursuant to an exception crafted by the Court to the Restatement rule, such liability may *not* be imputed when the managerial agent's within the scope actions are "contrary to the employer's good faith efforts to comply with Title VII". **Id**. at 2129 (quotation omitted).[2]

---

[2]This good faith defense is designed "to avoid undermining the objectives underlying Title VII"; the statute's "primary objective is a prophylactic one" — "not to provide redress but to avoid harm". **Kolstad**, 119 S. Ct. at 2129 (quotation omitted).

Of course, Supreme Court decisions apply retroactively and prospectively to all cases on direct appeal whenever applied to the litigants before the Court. *Harper v. Virginia Dept. of Taxation*, 509 U.S. 86, 97 (1993). When law changes in unanticipated ways during an appeal, however, this court will generally remand for a new trial to give parties the benefit of the new law and the opportunity to present evidence relevant to that new standard. The motivation of this rule is fairness: to prevent injustice to a party who had no reason to expect a changed rule at the time of trial. *See Hill v. International Paper Co.*, 121 F.3d 168, 176-77 (5th Cir. 1997) (remand appropriate "in fairness to the court and the parties", where "law has changed — rather dramatically" causing "mid-course change in Mississippi law"); *Vicknair v. Formosa Plastics Corp., Louisiana*, 98 F.3d 837, 839 (5th Cir. 1996) ("supervening jurisprudential 'sea change'" justified remand); *Millipore Corp. v. Travelers Indemnity Company*, 115 F.3d 21, 34 (1st Cir. 1997) ("significant intervening clarification of the law" required allowing parties opportunity to present new evidence); *E.E.O.C. v. Westinghouse Elec. Corp.*, 925 F.2d 619, 633 (3d Cir. 1991) (no remand for new evidence where "the need, or certainly the helpfulness, of such evidence [was] reasonably apparent to ordinarily prudent counsel" at time of trial).

Accordingly, we must consider the law of this circuit at the time of Deffenbaugh's trial to determine whether *fairness* requires

**7**

affording Wal-Mart the opportunity to present new evidence under *Kolstad*. In this regard, we are principally guided by *Patterson*, released the week before trial and available electronically on the same day on the Fifth Circuit's Electronic Dissemination of Opinions Service (EDOS) bulletin-board system (listed under the subcategory "Civil Rights - Damages"), and within two days on Westlaw. (Opinions are now released electronically on the Fifth Circuit's World Wide Web site.)

At the outside, *Patterson* was within the reach of an informed attorney several days before Wal-Mart's decision to rest. Moreover, in that, post-verdict, the district court ordered briefing on the effect of *Patterson* and relied upon it in rendering the JMOL, the district court charged the parties with knowledge of *Patterson* in earlier presenting their evidence at trial.

*Patterson* involved a bench trial under 42 U.S.C. § 1981 and Title VII. Regarding punitive damages against the employer, PHP Healthcare, the opinion stated:

> [T]he imposition of punitive damages under § 1981 and Title VII requires that the discrimination be malicious or done with reckless indifference. *Jones* [*v. Western Geophysical Co.*], 761 F.2d [1158,] 1162 [(5th Cir. 1985)]; *and see* 42 U.S.C. § 1981a. All of the discriminatory acts in this case were solely acts of Kennedy. Kennedy was not a corporate officer of PHP Healthcare but was a "project manager" of the Fort Hood office. *PHP Healthcare provided a handbook which expressly established a policy of non-discrimination and explained how employees*

*could complain about discriminatory practices to the company.* Further, the vice president of human resources ... testified that memos were distributed throughout the Fort Hood facility which also set out the procedures for making complaints to headquarters. No evidence suggests that [plaintiffs] Brown or Patterson followed these procedures in an attempt to notify PHP Healthcare's corporate office that Kennedy was discriminating against black employees. *The record is completely void of evidence showing that PHP Healthcare took part in any discriminatory conduct much less any "malicious" or "reckless" conduct. The existence of the employment handbook setting forth a policy of non-discrimination is at least prima facie evidence of awareness on the part of PHP Healthcare of the federally protected rights of [plaintiffs] Brown and Patterson; and there is nothing in this record which purports to show that PHP Healthcare took any action which was inconsistent with that policy.* Similarly, there is nothing in the record which would show that PHP Healthcare had knowledge of Kenendy's malicious or reckless conduct, or authorized, ratified, or approved Kennedy's actions. *See* **Fitzgerald** [**v. Mountain States Telephone & Telegraph**], 68 F.3d [1257,] 1263 [(10th Cir. 1995)] (refusing to impose punitive damages under § 1981 where employer took no part in the intentional discrimination). Although Kennedy was the project manager of PHP Healthcare's Fort Hood facility, his actions alone, without some evidence showing that PHP Healthcare knew or should have known of Kennedy's malicious or reckless conduct, are insufficient to cause punitive damages to attach directly to PHP Healthcare.

90 F.3d at 944 (emphasis added). A footnote, quite relevant for our purposes, followed:

We have affirmed a district court's refusal to impose punitive damages based on *evidence that a defendant had taken steps to eliminate*

**9**

> *racial discrimination* and the ambiguous nature of the evidence at the district court. ***Jones v. Western Geophysical Co.***, 761 F.2d [1158,] 1162 [(5th Cir. 1985)]. When prompt remedial measures were taken by the employer, the evidence "did not compel the conclusion that the [defendant] had behaved maliciously." ***Id.*** at 1162. Similarly, the evidence in this case does not compel the conclusion that PHP Healthcare behaved in a manner which warranted the imposition of punitive damages.

***Id.*** at 944 n.15 (emphasis added). Consistent with the rule adopted three years later in ***Kolstad***, ***Patterson*** thus put Wal-Mart on notice that evidence of a faithfully-adhered-to non-discrimination policy may bar imputing punitive damages liability to an employer when its employee acts with malice or reckless indifference.

Alternatively, even if, *in fairness*, we could *not* expect the parties, at the time of trial, to have been aware of ***Patterson***, the authorities on which it (and ***Kolstad***) relied had been available long earlier. Reasoning from 42 U.S.C. § 2000e(b)'s definition that "employer" includes "agents", ***Meritor Savings Bank, FSB v. Vinson***, 477 U.S. 57, 72 (1986), referred generally to the Restatement (Second) of Agency as the source of "agency principles" to guide Title VII. Moreover, the Restatement, adopted in 1957, has roots in such old cases as ***Lake Shore & M.S. R. Co. v. Prentice***, 147 U.S. 101, 110 (1893) (punitive damages available only if an act is "brought home to the corporation"); *see* ***Kolstad***, 119 S. Ct. at 2127 (describing roots of Restatement view).

10

Section 1981a, Title VII's punitive damages provision, was based on §§ 1983 and 1981 standards. *See, e.g.*, **Patterson**, 90 F.3d at 941 (citing explicit, unambiguous legislative history of Civil Rights Act of 1991); **Kolstad**, 119 S. Ct. at 2124 (noting that § 1981a's language was taken directly from the § 1983 case **Smith v. Wade**, 461 U.S. 30 (1983)). Restatement § 217C (or the identical Restatement (Second) of Torts § 909) has also been long applied to punitive damages under 42 U.S.C. § 1981. *E.g.*, **Fitzgerald v. Mountain States Telephone & Telegraph Co.**, 68 F.3d 1257, 1263 (10th Cir. 1995) (as noted, cited in **Patterson**, 90 F.3d at 944); **Mitchell v. Keith**, 752 F.2d 385, 389-90 (9th Cir. 1985).

Several courts have used "good faith" in this context as the natural converse to malice or reckless indifference. *E.g.*, **Hopwood v. Texas**, 78 F.3d 932, 959 (5th Cir. 1996) (damages under § 1981); **Barber v. Nabors Drilling U.S.A., Inc.**, 130 F.3d 702, 710 (5th Cir. 1997) (damages under ADA); *see also* BLACK'S LAW DICTIONARY 693 (6th ed. 1990) ("good faith" includes, among other things, "absence of malice"); *cf*. **Meritor**, 477 U.S. at 72 ("policy against discrimination" is "plainly relevant" to employers' Title VII liability).

In short, **Kolstad**'s imputation holding was not such a sudden shift as to require, *in fairness*, giving Wal-Mart an opportunity to

**11**

present additional evidence.  Therefore, we consider the JMOL in the light of **Kolstad**.[3]

B.

As noted, Wal-Mart offered no jury instructions relating specifically to agency or punitive damages.  The jury was instructed that

> [a] corporation may only act through natural persons, who are known as its agents.  In general, any agent or representative of a corporation *possessing adequate authority* may bind the corporation by his acts, declarations, and omissions.

(Emphasis added.)  Beyond this brief statement, the jury was left on its own to decide whose actions (Gipson's or Norman's, for instance) to impute to Wal-Mart, or what constituted "adequate authority".  The jury was asked whether, all things considered, "Wal-Mart" acted with malice or reckless indifference.[4]  Obviously,

---

[3]This conclusion is consistent with post-**Kolstad** opinions from other courts, none of which have required a new trial under its standards after a jury considered the issue pre-**Kolstad**.  *See, e.g.*, **Kimbrough v. Loma Linda Development**, — F.3d —, —, 1999 WL 493275, *2 (8th Cir. 1999) (affirming punitive damage award); **Blackmon v. Pinkerton Sec. & Investigative Services**, — F.3d —, —, 1999 WL 437218, *7 (8th Cir. 1999) (reversing district court's JMOL on punitive damages and remanding for reinstatement, finding, *inter alia,* employer's remedial response inadequate).

[4]The § 1981a-based instruction stated:

> If you find that [Deffenbaugh] has proved by a preponderance of the evidence that Wal-Mart discriminated against her based on race, then you may consider whether also to award her punitive damages.  The purpose of punitive
damages is to punish a wrongdoer forextraordinary misconduct, and

**12**

if a more specific instruction had been requested, *Kolstad* (as would have the law then extant) would support the propriety of its being granted.  But, Wal-Mart did not question the instructions either at trial or on appeal.[5] We note that the *Patterson* and agency issues in Wal-Mart's FED. R. CIV. P. 50(b) post-verdict renewed motion for JMOL were not raised in its FED. R. CIV. P. 50(a) motion for JMOL at the close of evidence; regarding punitive damages, the first motion merely asked the court to "find as a matter of law that Wal-Mart may not be found liable for punitive

---

to warn others against engaging in similar conduct.  In this case you have discretion to award punitive damages if you find by a preponderance of the evidence that Wal-Mart discriminated against [Deffenbaugh]:

> (1) with malice, that is, out of ill will, spite or for the purpose of causing injury to [Deffenbaugh]; or

> (2) with reckless indifference to [Deffenbaugh's] right to be free from discrimination based on race.

[5]Needless to say, failure to request a jury instruction does not preclude a later JMOL. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 513-14 (1988).  In this regard, we note that the *Patterson* and agency issues in Wal-Mart's FED. R. CIV. P. 50(b) post-verdict renewed motion for JMOL were not raised in its FED. R. CIV. P. 50(a) JMOL motion at the close of evidence.  Regarding punitive damages, the pre-verdict motion merely asked the court "as a matter of law [to] find that Wal-Mart may not be found liable for punitive damages if the jury finds liability".  Rule 50(b) motions may not, of course, raise issues not raised under Rule 50(a), *Morante v. American General Financial Center*, 157 F.3d 1006, 1010 (5th Cir. 1998); but, new grounds may be considered where, as here, the non-movant does not object, *Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir. 1996).

**13**

damages if the jury finds liability". **[5 R 141]** Rule 50(b) motions may not, of course, raise issues not raised under Rule 50(a), ***Morante v. American General Financial Center***, 157 F.3d 1006, 1010 (5th Cir. 1998), but new grounds may be considered where, as here, the non-movant does not object, ***Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.***, 100 F.3d 429, 435 (5th Cir. 1996).

A JMOL is reviewed *de novo*, *e.g.*, ***King v. Ames***, 179 F.3d 370, 373 (5th Cir. 1999), under the well-known standard of ***Boeing Co. v. Shipman***, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc), *overruled on other grounds*, ***Gautreaux v. Scurlock Marine, Inc.***, 107 F.3d 331 (5th Cir. 1997) (en banc):

> On motions for [JMOL] the Court should consider all of the evidence–not just that evidence which supports the non-mover's case–but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. *On the other hand, if there is substantial evidence opposed to the motions*, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for [JMOL] should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. *However,*

> *it is the [Seventh Amendment] function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.*

(Emphasis added.)

1.

The district court, applying **Patterson**, concluded that only Norman (regional manager), not Gipson (district manager for departments in six stores), was sufficiently high in the Wal-Mart hierarchy for possibly imputing punitive damages to Wal-Mart. However, under **Kolstad**, sufficient evidence to survive JMOL exists that Gipson was a requisite "managerial agent". He had supervisory authority over Deffenbaugh, terminated her on his own authority, and was, as noted, in charge of departments at six stores. As **Kolstad** noted, whether an agent is a manager is a "fact-intensive" inquiry. 119 S. Ct. at 2128. "[A]n employee must be important, but perhaps need not be the employer's top management, officers, or directors, to be acting in a managerial capacity." **Id.** (quotations omitted).

One of the **Kolstad**-cited treatises notes:

> The key ... in determining whether an agent acts in a managerial capacity is to look at what the individual is authorized to do by the principal and to whether that agent has discretion as to both what is done and how it is done. Job titles ... should be of little importance in the determination.

**15**

2 J. Ghiardi & J. Kirchner, Punitive Damages: Law and Practice § 24.05, at 15 (1998) (cited by *Kolstad*, 119 S. Ct. at 2128).  Another *Kolstad*-cited treatise echoes these remarks and adds that, "[u]ltimately, the court or jury will have to decide this issue on the particular facts of the case".  L. Schlueter & K. Redden, Punitive Damages § 4.4(B)(2)(a), at 181-82 (3d ed. 1995) (cited by *Kolstad*, 119 S. Ct. at 2128).  *Fitzgerald*, cited by *Kolstad* (again, cited also by *Patterson*), refers in assessing § 217C manager status to the "typical discretion of a manager, such as the power to make independent decisions regarding personnel matters or determine policy". 68 F.3d at 1263-64.

Gipson, of course, had authority to make personnel decisions regarding Deffenbaugh and others in her department and in those of five other stores.  In sum, substantial evidence existed from which a jury could reasonably find that Gipson was a managerial agent, acting in the scope of employment.[6]

---

[6]In its en banc brief, but not its post-*Kolstad* brief, Wal-Mart contended that Gipson acted outside the scope of his employment, relying on the statement in *Ellerth*, 118 S. Ct. at 2266-67, that "unlawful discrimination" typically falls outside the scope of employment. (In its post-*Kolstad* brief, Wal-Mart disavows *Ellerth*, in the light of *Kolstad*, as being "pertinent or applicable authority in the punitive damages analysis".)  Assuming that, despite *Kolstad*, Wal-Mart continues to press this point, it is laid to rest by *Kolstad*. 119 S. Ct. at 2128 ("even intentional torts are within the scope of an agent's employment if the conduct is the kind the employee is employed to perform, occurs substantially within the authorized time and space limits, and is actuated, at least in part, by a purpose to serve the employer"; such action is within the scope "even if the employee ... uses forbidden means of accomplishing results") (quotation omitted).  In this light, for

**16**

2.

In rejecting an "egregiousness" requirement, **Kolstad**, 119 S. Ct. at 2124-26, leaves intact our previous conclusion, 156 F.3d at 593-94, that Gipson's actions manifested the requisite malice or reckless disregard of Deffenbaugh's federal rights.

3.

Concerning the good-faith defense, Wal-Mart's only evidence (elicited in cross-examining Deffenbaugh) was that it (Wal-Mart) encourages employees to contact higher management with grievances. Plainly, such evidence does not suffice to establish, as a matter of law, Wal-Mart's good faith in requiring its managers to obey Title VII. Wal-Mart presented no evidence either of its response to Deffenbaugh's complaint, or of *any* specific Title VII efforts; nor did it explain, for JMOL purposes, how a Wal-Mart manager's comment on her perceived Wal-Mart corporate hostility to interracial relationships could pass unrebutted at a meeting with two other Wal-Mart managers present.

Deffenbaugh, on the other hand, presented substantial evidence that Wal-Mart failed to respond effectively to her complaints about Gipson's racial animus: despite Norman's promise to check into her complaint of hostility to her interracial relationship, she was fired the next month on pretextual grounds. Wal-Mart's minimal

imputing Title VII punitive damages to Wal-Mart, Gipson acted within the scope of his employment in disciplining and terminating Deffenbaugh.

**17**

presentation left the jury wide latitude to infer that any Wal-Mart policy against discrimination was too poorly enforced to distinguish Wal-Mart's actions from Gipson's. For JMOL purposes, the evidence of Wal-Mart's antidiscrimination good faith was certainly not so overwhelming that reasonable jurors could not conclude otherwise.

### C.

No intervening authority affects our concerns, 156 F.3d at 594-98, regarding the size of the jury's punitive damages award. Consideration of the relative reprehensibility of Wal-Mart's conduct, the punitive/compensatory damages ratio, and the similarity to other awards led us to order a remittitur to $75,000; we do so again. Because of Deffenbaugh's stipulation to accepting the reduced award, we need only remand for entry of judgment.

### III.

For the foregoing reasons, the judgment as to punitive damages is **REVERSED** and this case **REMANDED** for reinstatement of punitive damages for Deffenbaugh, in the reduced amount of $75,000.[7]

*REVERSED and REMANDED*

---

[7]As noted, pursuant to the partially reinstated prior panel opinion, the balance of the judgment, including the compensatory damages award, has already been **AFFIRMED.**